**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:     Justices:
Maura D. Corrigan    Michael F. Cavanagh
                Elizabeth A. Weaver
                Marilyn Kelly
                Clifford W. Taylor
                Robert P. Young, Jr.
                Stephen J. Markman

**FILED JULY 30, 2004**

TAXPAYERS OF MICHIGAN AGAINST CASINOS,
AND LAURA BAIRD,

    Plaintiffs-Appellants,

v                            No. 122830

THE STATE OF MICHIGAN,

    Defendant-Appellee,

and

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY, INC, IV, and GAMING
ENTERTAINMENT, LLC.,

    Intervening Defendants-Appellees,
_____

BEFORE THE ENTIRE BENCH

CORRIGAN, C.J.

    In this declaratory action, we must determine: (1) whether House Concurrent Resolution (HCR) 115 (1998), the Legislature's approval by resolution of tribal-state gaming compacts, constituted "legislation" and therefore violated Const 1963, art 4, § 22; (2) whether the compacts' amendatory provision providing that the Governor may amend

the compacts without legislative approval violates the separation of powers doctrine found in Const 1963, art 3, § 2; and (3) whether HCR 115 is a local act in violation of Const 1963, art 4, § 29.

We hold that the Legislature's approval of the compacts through HCR 115 did not constitute legislation. In approving those compacts by resolution, the Legislature did not modify Michigan law in any respect; instead, the Legislature simply expressed its approval of valid contracts between two independent, sovereign entities. Although Michigan's gaming law would have applied to gaming on tribal lands in the absence of a tribal-state compact, it applied only as a matter of *federal* law. Compacts establishing the terms of class III gaming on tribal lands modified only federal law. Therefore, our Constitution does not require that our Legislature express its approval of these compacts through bill rather than resolution.

We further hold that although the issue of the amendment provision in the compacts may now be ripe for review, the lower courts have yet to review this issue and make any specific findings regarding whether the amendatory provision in the compacts, as now invoked by Governor Granholm, violates the separation of powers provisions found in Const 1963, art 3, § 2. Finally, we hold that HCR

2

115 is not a "local act" and therefore does not violate Const 1963, art 4, § 29. Accordingly, we remand the amendment provision issue to the Court of Appeals for consideration, but otherwise affirm the decision of the Court of Appeals.

## I. FACTUAL HISTORY AND PROCEDURAL POSTURE

### A. BACKGROUND: FEDERAL LAW REGARDING TRIBAL GAMING

Knowledge of the underlying federal law is necessary to understand the factual posture of this case. In *California v Cabazon,* 480 US 202, 207; 107 S Ct 1083; 94 L Ed 2d 244 (1987), the United States Supreme Court held that state laws may only be applied to tribal lands "if Congress has expressly so provided." The Court held that because Congress had not provided for the regulation of tribal gaming, a state could only prohibit gaming on tribal lands if the state completely prohibited all gaming within its borders.

In response to *Cabazon,* Congress passed the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq.*, which divides gaming activities into three classes. Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 USC 2703(6). Class

**3**

II gaming includes bingo and card games (but not banking card games) that are played in conformance with state laws and regulations regarding hours of operation and limitations on wagers or pot sizes. 25 USC 2703(7). Class III gaming includes all other forms of gambling, including casino gaming. 25 USC 2703(8).

At issue in this case is class III gaming. Under IGRA, tribes may engage in class III gaming only pursuant to a tribal-state compact that is approved by the Secretary of the Interior. 25 USC 2710(d) provides, in relevant part:

> (1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
>
> * * *
>
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
>
> (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.
>
> * * *
>
> (3) (A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request,

4

the State shall negotiate with the Indian tribe in good faith to enter into such a compact.[1]

\* \* \*

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to -

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

---

[1] In *Seminole Tribe of Florida v Florida*, 517 US 44; 116 S Ct 1114; 134 L Ed 2d 252 (1996), the United States Supreme Court held that 25 USC 2710(d)(7), which permits Indian tribes to sue a state in federal court when that state has refused to negotiate in good faith for a tribal-state compact, was an unconstitutional violation of state sovereign immunity as preserved by the Eleventh Amendment of the United States Constitution.

*  *  *

       (5)  Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal-State compact entered into by the Indian tribe under paragraph (3) that is in effect.

Through § 2710(d), Congress expressly provided for tribal-state negotiations regarding class III gaming. Through this compacting process, the tribes and the states may agree to the terms governing such gaming.

### B.  FACTUAL HISTORY

The compacts at issue in this case were first signed by Governor Engler and four Indian tribes[2] in January of 1997. Each compact provided that it would take effect after "[e]ndorsement by the Governor of the State and concurrence in that endorsement by resolution of the Michigan Legislature."[3] The compacts were modified and re-

---

[2] These tribes are the Little Traverse Bay Band of Odawa Indians, the Pokagon Band of Ottawa Indians, the Little River Band of Ottawa Indians, and the Nottawaseppi Huron Potawatomi. The Little Traverse Bay Band and the Little River Band currently operate casinos.

[3] See § 11 of the compacts.

**6**

executed in December 1998, and the Legislature then approved the compacts by resolution through HCR 115.[4]

The validity of the 1998 compacts was challenged through several lawsuits.[5] Plaintiffs filed this suit against defendant in the Ingham Circuit Court, seeking a declaratory judgment that the compacts do not comport with various constitutional provisions. Plaintiffs argue that the compacts amount to legislation and, therefore, pursuant to Const 1963, art 4, § 22 the Legislature was required to adopt them by bill rather than approve them by resolution. The circuit court held that the compacts should have been approved by bill. The Court of Appeals reversed the circuit court decision, concluding that the compacts do not

---

[4] Although a bill must be passed by a majority of elected and serving members of the Legislature, a resolution may be passed by a majority vote of those legislators present at the time, provided a quorum is present. The House of Representatives approved the 7compacts by a resolution vote of 48 to 47, and the Senate followed suit by a resolution vote of 21 to 17.

[5] The Sault Ste. Marie Tribe of Lake Superior sued in federal court to enjoin the operation of the new casinos, but the United States Court of Appeals for the Sixth Circuit dismissed this suit on standing grounds. *Sault Ste Marie Tribe v United States*, 288 F3d 910 (CA 6, 2002). Two state legislators also challenged the approval of the Secretary of Interior of Michigan's 1998 compacts, but that suit was also dismissed on standing grounds by the United States Court of Appeals for the Sixth Circuit. *Baird v Norton,* 266 F3d 408 (CA 6, 2001).

7

constitute legislation because they contain no enforcement provision that would ensure that their terms are satisfied and because the power of the state to legislate in this area is preempted by federal law. The Court of Appeals opined that the compacts constitute mere contracts and, therefore, approval by resolution was not constitutionally infirm.

Plaintiffs also contend that the provision in the compacts that purports to empower the Governor to amend them without legislative approval violates Const 1963, art 3, § 2, the "separation of powers" doctrine. The circuit court agreed with plaintiffs. The Court of Appeals, however, reversed the decision of the circuit court on the basis that the amendatory provision issue was not ripe for review because the Governor had not yet attempted to amend the compacts.

Plaintiffs further argue that the compacts violate Const 1963, art 4, § 29, the "local acts" clause. The circuit court disagreed, holding that art 4, § 29 is not implicated. The Court of Appeals agreed and affirmed the circuit court on this issue.

This Court granted leave to appeal.

## II. Standard of Review

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Van v Zahorik*, 460 Mich 320, 326; 597 NW2d 15 (1999). The constitutionality of a legislative act is a question of law that is reviewed de novo. *DeRose v DeRose*, 469 Mich 320, 326; 666 NW2d 636 (2003).

## III. The Legislature's Approval of the Compacts Was Not Legislation

Resolution of whether HCR 115 constituted legislation necessarily turns on the definition of "legislation." Plaintiffs argue that the Legislature's approval of the compacts must be legislation because HCR 115 had the effect of altering legal rights and responsibilities. We find this definition of "legislation" overly simplistic. Although it is true that legislation alters legal rights and responsibilities, not everything that alters legal rights and responsibilities can be considered legislation. Legal rights and responsibilities may also be altered through contracts. Therefore, the fact that the legal rights or responsibilities of the parties involved may have been altered in some way is not dispositive.

We hold that a more accurate definition of "legislation" is one of unilateral regulation. The Legislature is never required to obtain consent from those

**9**

who are subject to its legislative power. *Boerth v Detroit City Gas Co*, 152 Mich 654, 659; 116 NW 628 (1908). This unilateral action distinguishes legislation from contract: "'The power to regulate as a governmental function, and the power to contract for the same end, are quite different things. One requires the consent only of the one body, the other the consent of two.'" *Detroit v Michigan Pub Utilities Comm*, 288 Mich 267, 288; 286 NW 368 (1939), quoting *City of Kalamazoo v Kalamazoo Circuit Judge*, 200 Mich 146, 159-160; 166 NW 998 (1918).

Here, the Legislature was required to approve the compacts only as the result of negotiations between two sovereigns: the Legislature could not have unilaterally exerted its will over the tribes involved. Because the tribes' consent is required by federal law, the compacts can only be described as contracts, not legislation.

A. THE STATE'S LIMITED ROLE UNDER IGRA

In order to understand the contractual nature of the compacts, it is essential to understand the state's limited role under federal law generally, as well as IGRA. Since at least 1832, the United States Supreme Court has recognized tribal sovereignty. In *Worcester v Georgia*, 31 US 515, 557; 8 L Ed 483 (1832), the United States Supreme Court noted that the tribes were "distinct political

communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guaranteed by the United States." This tribal sovereignty is limited only by Congress: "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance." *United States v Wheeler*, 435 US 313, 323; 98 S Ct 1079; 55 L Ed 2d 303 (1978). Similarly, only the federal government or the tribes themselves can subject the tribes to suit; tribal immunity "is not subject to diminution by the States." *Kiowa Tribe of Oklahoma v Mfg Technologies, Inc*, 523 US 751, 754, 756; 118 S Ct 1700; 140 L Ed 2d 981 (1998). Through IGRA, however, Congress has permitted the states to negotiate with the tribes through the compacting process to shape the terms under which tribal gaming is conducted. The states have no authority to regulate tribal gaming under the IGRA unless the tribe explicitly consents to the regulation in a compact.

Although 25 USC 2710(d)(1)(C) provides that class III gaming activities are only lawful if conducted in conformance with a tribal-state compact, that does not mean the states have any authority to regulate class III gaming

activities in the absence of a compact. States may not enforce the terms of IGRA; rather, the only enforcement provided for in the IGRA is through the federal government. The IGRA provides that civil enforcement lies only with the tribes themselves or with the National Indian Gaming Commission, which was created by IGRA. 25 USC 2713. Judicial review of the Commission's decision may only be obtained in federal court. 25 USC 2714. Similarly, criminal enforcement is left solely to the federal government under 18 USC 1166(d). See also *Gaming Corp of America v Dorsey & Whitney*, 88 F3d 536, 545 (CA 8, 1996) ("Every reference to court action in IGRA specifies federal court jurisdiction. . . . State courts are never mentioned."). In other words, although it may be "unlawful" for the tribes to engage in class III gaming absent a compact, the Legislature is powerless to regulate or prohibit such gaming. State legislatures have no regulatory role under IGRA aside from that negotiated between the tribes and the states.

In *Gaming Corp, supra* at 546-547, the court explained:

> Congress thus left states with no regulatory role over gaming except as expressly authorized by IGRA, and under it, the only method by which a state can apply its general civil laws to gaming is through a tribal-state compact. Tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal

**12**

> government, the states, and the tribes. They are a creation of federal law, and IGRA prescribes "the permissible scope of a Tribal-State compact, see § 2710(d)(3)(C)." *Seminole Tribe of Florida v Florida*, [517 US 44; 116 S Ct 1114; 134 L Ed 2d 252 (1996).] Such compacts must also be approved by the Secretary of the Interior. § 2710(d)(3)(B).
>
> * * *
>
> Congress thus chose not to allow the federal courts to analyze the relative interests of the state, tribal, and federal governments on a case by case basis. Rather, it created a fixed division of jurisdiction. If a state law seeks to regulate gaming, it will not be applied. If a state law prohibits a class of gaming, it may have force. The courts are not to interfere with this balancing of interests, they are not to conduct a *Cabazon* balancing analysis. This avoids inconsistent results depending upon the governmental interests involved in each case. With only the limited exceptions noted above, Congress left the states without a significant role under IGRA unless one is negotiated through a compact.

The only way the states can acquire regulatory power over tribal gaming is by tribal consent of such regulation in a compact.

In fact, our Legislature has recognized that the state's regulatory authority cannot extend to tribal gambling. MCL 432.203(5) provides that state regulation of tribal casinos can only occur "[i]f a federal court or agency rules or federal legislation is enacted that allows a state to regulate gambling on Native American land." Absent such federal authorization, MCL 432.203(2)(d)

**13**

acknowledges that the state's gambling regulatory requirements do *not* apply to "[g]ambling on Native American land and land held in trust by the United States for a federally recognized Indian tribe on which gaming may be conducted under [IGRA]."

Further, contrary to plaintiffs' contentions, 18 USC 1166 does not change this analysis. Section 1166 provides:

> (a) Subject to subsection (c), *for purposes of Federal law*, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.

> (b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

> (c) For the purpose of this section, the term "gambling" does not include—

> (1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or

> (2) class III gaming conducted under a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act [25 USC 2710(d)(8)] that is in effect.

**14**

(d) *The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act [25 USC 2710(d)(8)], or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.* [Emphasis added.]

Section 1166 does *not* grant the state regulatory authority over tribal gaming; rather, it simply incorporates state laws as the federal law governing nonconforming tribal gaming. Thus, although a state's gaming laws apply in the absence of a tribal-state compact, they apply only *as federal law*. It follows that when the Legislature approves a tribal-state compact, it approves a change in *federal* law rather than its own.

Moreover, this "federalization" of state law regulating gambling does not give a state enforcement power over violations of state gambling laws on tribal lands because "the power to enforce the incorporated laws rests solely with the United States." *United Keetoowah Band of Cherokee Indians v Oklahoma*, 927 F2d 1170, 1177 (CA 10, 1991). The state remains powerless to assert any regulatory authority over tribal gaming *unless* the tribes have assented to such authority in a compact under IGRA.

**15**

*AT&T Corp v Coeur D'Alene Tribe*, 295 F3d 899, 909 (CA 9, 2002).

Although 18 USC 1166(d) effectively "borrows" Michigan law for purposes of federal law, it does not delegate any regulatory power to the states. Section 1116(d) is not a way to extend the state's power to regulate tribes through the federal government. Rather, the federal government may conclude at any time that it will no longer apply state law and so amend the IGRA. In other words, the fact that, for purposes of expediency, the federal government has currently chosen to apply Michigan law for purposes of federal law does not mean that it will always choose to do so. Therefore, § 1166(d) cannot be viewed as a delegation of regulatory power to the states.

### B.   The Contractual Nature of Compacts

As explained above, IGRA only grants the states bargaining power, not regulatory power, over tribal gaming. The Legislature is prohibited from unilaterally imposing its will on the tribes; rather, under IGRA, it must negotiate with the tribes to reach a mutual agreement.[6]   As

---

[6] IGRA even prohibits the state from frustrating the tribe's desire to enter into class III gaming by refusing to negotiate. In the event that a state will not negotiate or an agreement cannot be reached, although under *Seminole*

(continued…)

**16**

further noted above, the hallmark of legislation is unilateral imposition of legislative will. Such a unilateral imposition of legislative will is completely absent in the Legislature's approval of tribal-state gaming compacts under IGRA. Here, the Legislature's approval of the compacts follows the assent of the parties governed by those compacts. Thus, the Legislature's role here requires mutual assent by the parties—a characteristic that is not only the hallmark of a contractual agreement but is also absolutely foreign to the concept of legislating. *Rood v Gen Dynamics Corp*, 444 Mich 107, 118; 507 NW2d 591 (1993). See *Confederated Tribes of the Chehalis Reservation v Johnson*, 135 Wash2d 734, 750; 958 P2d 260 (1998) ("Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts.")

Further, the compacts approved by HCR 115 do not apply to the citizens of the state of Michigan as a whole; they only bind the two parties to the compact. Legislation "looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." *Dist of Columbia*

---

(…continued)

*Tribe* the state may not be sued, it appears that the tribe may approach the Secretary of the Interior, who can approve a compact under 25 USC 2710(d)(8).

**17**

*Court of Appeals v Feldman*, 460 US 462, 477; 103 S Ct 1303; 75 L Ed 2d 206 (1983), quoting *Prentis v Atlantic Coast Line Co*, 211 US 210, 226; 29 S Ct 67; 53 L Ed 150 (1908). Here, the compacts approved by HCR 115 have no application to those subject to legislative power; rather, they only set forth the parameters within which the tribes, as sovereign nations, have agreed to operate their gaming facilities. Under the terms of the compacts, the tribes themselves, not the state, regulate the conduct of class III gaming on tribal lands. The Legislature has no obligations regarding the regulation of gaming whatsoever, nor can the state unilaterally rectify a violation of the compacts.

Similarly, in approving the compacts at issue here, the Legislature has not dictated the rights or duties of those other than the contracting parties. Despite plaintiffs' arguments to the contrary, we find that § 18 of the compacts does not obligate local units of government to create local revenue sharing boards. Indeed, because the local government units are not parties to the contract, it would not be possible for the compacts to impose *any* obligations on the local governments. Third parties cannot be bound by the terms of the compacts. Instead, the compacts make local units of government third-party

**18**

beneficiaries of the compacts, with the creation of the revenue sharing boards simply a condition precedent to receiving those benefits. A party is a third-party beneficiary if the promisor "has undertaken to give or do or refrain from doing something directly to or for said person." MCL 600.1405(1). Here, the tribes have promised to give 2% of their net earnings to local communities, provided those communities create the revenue sharing boards to receive and disburse the payments. If the local governments choose not to create the sharing boards, they simply can no longer receive the benefit of the funds. But they are under no *obligation* to create the revenue sharing boards and receive the benefit granted by the tribes.

Further, we reject plaintiffs' argument that the Legislature's approval by resolution has affected the rights of state citizens by setting age limitations for gaming or employment in the tribal casinos. These restrictions are not restrictions on the citizens of Michigan; rather, they are restrictions only on the *tribes*. The compacts provide the minimum requirements that the *tribes* agree to use in hiring and admitting guests to the casinos. The state has no power to regulate the casinos or enforce violations of the compact, but must use the dispute

**19**

resolution procedure provided in the compacts if a violation occurs.

Finally, we hold that the Legislature's approval of the tribal-state compacts does not create any affirmative state obligations. The compacts do not create any state agencies or impose any regulatory obligation on the state. The state also has no responsibility to enforce the compacts' requirements—that responsibility falls on the tribes alone. In this way, the compacts here can be distinguished from those at issue in the cases relied upon by plaintiffs. In *Kansas v Finney*, 251 Kan 559; 836 P2d 1169 (1992), the compact at issue created a state gaming agency responsible for monitoring the tribe's compliance with the contract, and the compact was not submitted to the legislature for any form of approval. The court found that, under Kansas law, the creation of a state agency was a legislative function. Absent an appropriate delegation of power by the legislature or legislative approval of the compact,[7] the compacts could not bind the state to the increased obligations. Unlike the compact in *Finney,* however, the compacts at issue here do not create any state

---

[7] The court did not specify what form that legislative approval would have to take.

agencies and were presented to the Legislature for approval.

Similarly, in *New Mexico v Johnson*, 120 NM 562; 904 P2d 11 (1995), the compacts authorized more forms of gaming than were otherwise permitted in New Mexico. As in *Finney*, the compacts were not presented to the state legislature for any form of approval. The court held that the governor could not enter into the compacts and thereby create new forms of gaming without "any action on the part of the legislature." *Id.* at 574. Unlike the compacts in *Johnson*, the compacts here do not create new forms of gaming and were presented to the Legislature for approval. Thus, the compacts do not impose new obligations on the citizens of the state subject to the Legislature's power; they simply reflect the contractual terms agreed to by two sovereign entities.

### C. LEGISLATIVE APPROVAL VIA RESOLUTION WAS APPROPRIATE

Once it is determined that HCR 115 did not constitute legislation, we must then determine whether resolution was an appropriate method of legislative approval of the compacts. We therefore turn to our Constitution. Our Constitution does not prohibit the Legislature from approving contracts, such as the compacts at issue here, by concurrent resolution. Unlike the federal constitution,

**21**

our Constitution "is not a grant of power to the legislature, but is a limitation upon its powers." *In re Brewster Street Housing Site*, 291 Mich 313, 333; 289 NW 493 (1939). Therefore, "the legislative authority of the state can do anything which it is not prohibited from doing by the people through the Constitution of the State or the United States." *Attorney General v Montgomery*, 275 Mich 504, 538; 267 NW 550 (1936). This has been discussed by this Court in the past by analogizing our Legislature to the English Parliament. See *Young v City of Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934), in which this Court stated:

> A different rule of construction applies to the Constitution of the United States than to the Constitution of a State. The Federal government is one of delegated powers, and all powers not delegated are reserved to the States or to the people. When the validity of an act of congress is challenged as unconstitutional, it is necessary to determine whether the power to enact it has been expressly or impliedly delegated to congress. The legislative power, under the Constitution of the State, is as broad, comprehensive, absolute and unlimited as that of the parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the State itself.[8]

---

[8] See also *Thompson v Auditor General*, 261 Mich 624, 642; 247 NW 360 (1933), in which the Court stated:

(continued…)

Regarding any limitations in our constitution, art 4, § 22 only requires the approval of *legislation* by bill, but is silent regarding the approval of contracts.

We have held that our Legislature has the general power to contract unless there is a constitutional limitation. *Advisory Opinion on Constitutionality of 1976 PA 240*, 400 Mich 311; 254 NW2d 544 (1977). It is acknowledged by all that our Constitution contains no limits on the Legislature's power to bind the state to a contract with a tribe; therefore, because nothing prohibits it from doing so, given the Legislature's residual power, we conclude that the Legislature has the discretion to approve the compacts by resolution.[9]

---

(…continued)

> The power of the legislature of this State is as omnipotent as that of the parliament of England, save only as restrained by the Constitution of the United States and the Constitution of this State. . . . 1 Cooley, Constitutional Limitations (8th Ed.), p. 354.

[9] In fact, action by concurrent resolution is common when the Constitution is silent regarding the appropriate procedure. Various constitutional provisions require legislative action but fail to specify its form: Const 1963, art 4, § 53 (appointment of auditor general); Const 1963, art 11, § 5 (approval of certain civil service pay increases); Const 1963, art 4, § 17 (establishing special legislative committees); and Const 1963, art 10, § 5 (designation of land as part of state land reserve). In such situations, the Legislature has historically acted by concurrent resolution.

This understanding of legislative power is well-established. Our Legislature has in the past used the resolution process to ratify amendments of the federal constitution. This Court has declared the resolution process proper in such a circumstance because the Legislature did not engage in a legislative act that enacted a law, but merely expressed its assent to the proposed amendment. *Decher v Secretary of State*, 209 Mich 565, 571; 177 NW 388 (1920). In the same way, the Legislature here is merely expressing its "assent" to the compacts through HCR 115.

More importantly, because our Legislature had the discretion to approve the compacts by resolution rather than by bill, the courts cannot interfere with that legitimate exercise of legislative discretion. As this Court recognized long ago in *Detroit v Wayne Circuit Judge*, 79 Mich 384, 387; 44 NW 622 (1890):

> It is one of the necessary and fundamental rules of law that the judicial power cannot interfere with the legitimate discretion of any other department of government. So long as they do no illegal act, and are doing business in the range of the powers committed to their exercise, no outside authority can intermeddle with them . . . .

Therefore, this Court should not interfere with the Legislature's discretionary decision to approve the compacts by resolution.

### IV. THE *BLANK/CHADHA* FACTORS

For the above reasons, we are not persuaded by plaintiffs' argument that the factors set forth in the lead opinion in *Blank v Dep't of Corrections*, 462 Mich 103; 611 NW2d 530 (2000), adopted from *Immigration & Naturalization Service v Chadha*, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983), apply to this case. *Blank* and *Chadha* involved the Legislature's power to alter or amend the statute delegating rule-making authority without doing so by statute. *Blank* held that once the Legislature grants power to an agency by statutory action, it cannot then diminish or qualify that power except by further statutory action. This "legislative veto" practice at issue in *Blank* also had a significant state constitutional history. Const 1963, art 4, § 37 allowed temporary legislative vetoes of agency regulations between legislative sessions. In 1984, the people rejected a proposal to amend § 37 and permit the type of permanent legislative veto at issue in *Blank*. The fact that the legislative veto at issue in *Blank* was not permitted by the Constitution and had been rejected by the people further illuminates the *Blank* decision.

No such environment exists here, however, as our Constitution is silent regarding the proper form of legislative approval of tribal-state gaming compacts under IGRA and the people have not expressed a view on this question.  Therefore, we do not believe that the *Blank/Chada* analysis should be applied here.

In response to the Justice Markman's dissent, however, we note that even were the *Blank/Chadha* analysis to be applied, the factors do not demonstrate that the Legislature's approval of the compacts was an act of legislation.

### A. THE COMPACTS DO NOT ALTER THE LEGAL RIGHTS, DUTIES, AND RELATIONS OF PERSONS OUTSIDE THE LEGISLATIVE BRANCH

To make sense, this factor must apply to persons outside the legislative branch who are subject to the Legislature's authority.  Here, the compacts do not give the state the power to alter the rights, duties, or relations of anyone subject to the Legislature's authority.  Rather, the compacts only set forth the parameters the tribes agree will apply to their operation of gaming facilities.  The Legislature has no regulatory duty under the compacts, nor do the compacts confer any "rights" upon the state other than contractual rights.  For example, although the state may inspect tribal facilities and

**26**

records, it has no power to enforce those provisions. Any contractual disputes under the compacts must be submitted to the dispute resolution procedure outlined in the compacts. All duties and restrictions in the compacts fall on the tribes themselves, who are sovereign entities and have consented to the restrictions and additional duties.

### B. THE RESOLUTION DID NOT SUPPLANT LEGISLATIVE ACTION

Unlike the actions taken in *Blank*, HCR 115 did not have the effect of amending or repealing existing legislation when it approved the compacts. As noted above, given the Constitution's silence regarding the form of approval necessary for tribal-state gaming compacts, the Legislature had the discretion to approve the compacts by resolution. Further, as explained above, the compacts do not impose any affirmative obligations on the state, create rules of conduct for Michigan citizens, or create new state agencies. Such changes would require legislation, but are absent from the compacts. Therefore, legislation is not required and this Court should not interfere with the Legislature's discretion in approving the compacts by concurrent resolution.

27

## C. The Compacts Do Not Involve Policy Determinations Requiring Legislation

First, it must be remembered that not all policy decisions made by the Legislature are required to be in the form of legislation. See *Blank*, *supra* at 170 (Cavanagh, J.). As the United States Supreme Court explained in *Yakus v United States*, 321 US 414, 424; 64 S Ct 660; 88 L Ed 834 (1944), "[t]he essentials of the legislative function are the determination of legislative policy *and its formulation and promulgation as a defined and binding rule of conduct . . . .*" (Emphasis added.) Here, HCR 115 neither promulgated a legislative policy as a defined and binding rule of conduct nor applied it to the general community. Instead, HCR 115 simply assented to the negotiated contract between two sovereign entities, recognizing that the compacts created no new legal rights or duties for the state or its citizens. Indeed, HCR 115 could never be considered a "promulgation of a legislative policy as a defined and binding rule of conduct" because the Legislature lacks the authority to bind the tribes at all. Without the tribes' approval, the compacts have no force. Through IGRA, Congress has determined that states may not unilaterally impose their will on the tribes regarding

gaming; rather, the states may only negotiate with the tribes through the compacting process.

### D. *CHADHA'S* CONSTITUTIONAL FACTOR IS NOT APPLICABLE GIVEN THE NATURE OF OUR STATE CONSTITUTION

As noted above, our Constitution differs from the federal constitution: the federal constitution *grants* Congress its power, while our Constitution *limits* the plenary power of our Legislature. As this Court has recognized:

> A different rule of construction applies to the Constitution of the United States than to the Constitution of a state. The federal government is one of delegated powers, and all powers not delegated are reserved to the states or to the people. When the validity of an act of Congress is challenged as unconstitutional, it is necessary to determine whether the power to enact it has been expressly or impliedly delegated to Congress. The legislative power, under the Constitution of a state, is as broad, comprehensive, absolute, and unlimited as that of the Parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the state itself. [*Young v Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934).]

Thus, the fourth *Chadha* factor, which was not applied in *Blank*, is inapplicable here because our Constitution does not *grant* authority to the Legislature, but instead limits the Legislature's plenary authority. As explained above, our Constitution's silence regarding the form of approval needed for tribal-state gaming compacts, therefore, does

**29**

not lead to the conclusion that the Legislature is prohibited from approving the compacts by resolution; rather, it leads to the conclusion that the form of the approval is within the discretion of the Legislature.

### V. THE AMENDMENT PROVISION ISSUE SHOULD BE REMANDED

Although we agree with plaintiffs that Governor Granholm's recent amendments make the amendment provision issue ripe for review, the lower courts have not yet been able to assess this issue since the amendments. It is not proper for us to do so now. Therefore, we remand this issue to the Court of Appealsto consider whether the provision in the compacts purporting to empower the Governor to amend the compacts without legislative approval violates the separation of powers doctrine found in Const 1963, art 3, § 2. The Court of Appeals should remand to the trial court if it determines that further fact-finding is necessary to resolve the issue.

### VI. HCR 115 DOES NOT VIOLATE CONST 1963, ART 4, § 29

The "local act" provision of art 4, § 29 of Michigan's Constitution provides:

> The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of

30

the electors voting thereon in the district affected. . . .

In *Hart v Wayne Co*, 396 Mich 259; 240 NW2d 697 (1976), this Court considered whether a provision of the municipal courts of record act requiring Wayne County to supplement salaries for recorder's court judges constituted a "local act" subject to Const 1963, art 4, § 29. We held that the provision did not constitute a "local act" because a recorder's court performs state functions and the funding of such a court is a state function. Id. at 272. In *Attorney General ex rel Eaves v State Bridge Comm*, 277 Mich 373; 269 NW 388 (1936), this Court considered whether state legislation authorizing a bridge to Canada located at Port Huron constituted a local act. We held again that it did not, stating: "The bridge in question is international in character and will be used by those from all parts of both nations who desire to enter or leave the United States through Port Huron." *Id*. at 378.

*Hart* and *Eaves*, applied to the facts of this case, lead to the same conclusion: tribal-state compacts are not "local acts." In the absence of express congressional consent, the Legislature has no authority to regulate casino gambling on Indian lands. Like the bridge in *Eaves*, Indian casinos, located as they are on tribal lands, are

"international in character" and are likely to be frequented by Michigan citizens from throughout the state as well as by members of various Indian tribes. Therefore, the approval of state compacts regarding Indian casinos pursuant to IGRA constitutes a unique state function with interests "international in character," rather than a function of a local unit of government with predominantly local interests. Thus, we hold that the compacts are not "local acts."

Further, tribal lands subject to compact negotiations are declared as such not by the state or even by the tribes, but by the Department of the Interior. The Department of the Interior has thus far granted to the tribes lands located in the counties specified in the compacts.[10] If, however, the department were to grant to a tribe lands located outside such counties, IGRA would direct the state to negotiate in good faith with the tribe

---

[10] The mere fact that Indian land is located in a specific county does not give that county jurisdiction over that land, just as Michigan does not have absolute jurisdiction over all tribal lands located within its borders. As already noted, absent express congressional consent, neither the state nor a local unit of government may regulate tribal affairs. Thus, the compacts are not "local acts" because the tribal lands that they regulate are not subject to local jurisdiction as contemplated by Const 1963, art 4, § 29.

to reach a compact applicable to that land as well. For this additional reason, we are not persuaded that the compacts are "local acts" merely because they reference those specific counties in which the tribes have thus far been granted lands by the department.

Accordingly, we affirm the decision of the Court of Appeals that the compacts do not violate Const 1963, art 4, § 29, albeit for the reasons expressed above.

VII. CONCLUSION

We hold that HCR 115 was a valid method of approving the compacts. The compacts, and hence the Legislature's approval of those compacts, do not alter the legal rights or duties of the state or its citizens, nor do they create any state agencies. Therefore, no legislation is required to approve them. Rather, the compacts are simply contracts between two sovereign entities. Without the compacts, the state is prohibited under IGRA from unilaterally regulating tribal gaming in any manner. Further, our Constitution does not limit the Legislature's discretion regarding the proper approval method for tribal-state gaming compacts. Absent a constitutional limitation, the Legislature has discretion to determine the appropriate method for approving a contract. Moreover, we hold that HCR 115 is not a "local act" and so does not violate Const 1963, art

33

4, § 29. Finally, because no lower courts have had the opportunity to consider the issue of the amendment provision in the compacts since the issue became ripe for review, we remand that issue to the Court of Appeals for consideration. In all other respects, we affirm the decision of the Court of Appeals.

Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.

CAVANAGH, J.

I concur only with respect to part IV.

Michael F. Cavanagh

MARKMAN, J.

I concur only with respect to part VI.

Stephen J. Markman

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD,

    Plaintiffs-Appellants,

v                                 No. 122830

THE STATE OF MICHIGAN,

    Defendant-Appellee,

and

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY, INC, IV, and GAMING
ENTERTAINMENT, LLC.,

    Intervening Defendants-Appellees,
_____

KELLY, J. (*concurring*).

    In 1997 and 1998, Governor John Engler negotiated tribal-state gaming compacts with four west Michigan tribes. Under their terms, the compacts would become effective only when all of the following occurred:

        (A) Endorsement by the tribal chairperson and concurrence in that endorsement by resolution of the Tribal Council;

        (B) Endorsement by the Governor of the State and concurrence in that endorsement by resolution of the Michigan Legislature;

        (C) Approval by the Secretary of the Interior of the United States; and

(D) Publication in the Federal Register. [Compact with Little Traverse Bands of Odawa Indians, § 11.]

The compacts met all four requirements and became effective on February 18, 1999.

The Legislature approved the compacts by concurrent resolution. The plaintiffs then filed suit asserting that the compacts are legislation. Consequently, they argue, the Michigan Constitution requires that they be approved only by bill. Const 1963, art 4, § 22. At issue in this appeal is whether the approval process used by the Michigan Legislature was constitutional.

A majority of Justices, myself included, hold that the tribal-state gaming compacts at issue are not legislation. They are more appropriately viewed as a communication between sovereign entities. The compacts do not impose duties on or restrict the people of the state. Instead, they are contractual in nature, conveying the rights and obligations of the parties, the state, and the various tribes. Therefore, the Legislature's approval by concurrent resolution was appropriate.

2

We find unpersuasive Justice Markman's reliance on this Court's decision in *Blank*[1] to reach a contrary conclusion. *Blank* is inapplicable to this case. Because the tribal-state gaming compacts are valid, a majority affirms the decision of the Court of Appeals in favor of defendants with the exception of the issue regarding the governor's recent compact amendment. On that issue, a majority agrees to remand the case to the Court of Appeals for consideration of the plaintiffs' argument.

## I. Standard of Review

The circuit court ruled for plaintiffs on cross-motions for summary disposition. Decisions on motions for summary disposition are reviewed de novo. *American Federation of State, Co and Muni Employees v Detroit*, 468 Mich 388, 398; 662 NW2d 695 (2003). The question presented is whether the legislative action was constitutional. Similarly, issues of constitutionality are reviewed de novo. *Harvey v Michigan*, 469 Mich 1, 6; 664 NW2d 767 (2003).

---

[1] *Blank v Dep't of Corrections*, 462 Mich 103; 611 NW2d 530 (2000). The *Blank* plurality adopted the United States Supreme Court's test regarding legislative veto enunciated in *Immigration & Naturalization Service v Chadha*, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983). 462 Mich at 115.

## II. The Role of Federal Law

Through the Commerce Clause, the United States Constitution grants the federal government exclusive jurisdiction over relations with Indian tribes. US Const, art I, § 8, cl 3. The clause gives Congress the power "[t]o regulate commerce with foreign nations, and among the several States, and with the Indian Tribes." *Id*. The so-called Indian Commerce Clause places relations with Indian tribes within "the exclusive province of federal law." *Oneida Co v Oneida Indian Nation of New York*, 470 US 226, 234; 105 S Ct 1245; 84 L Ed 2d 169 (1985). Given the existence of the Indian Commerce Clause, state law generally is not applicable to Indians on tribal reservations unless Congress has specifically made it applicable. *McClanahan v Arizona State Tax Comm*, 411 US 164, 170-171; 93 S Ct 1257; 36 L Ed 2d 129 (1973).

In recognition of this principle, the United States Supreme Court has held that, if state gambling policy is regulatory rather than prohibitory, then state law is inapplicable to Indian gaming on Indian lands. *California v Cabazon Band of Indians*, 480 US 202, 209; 107 S Ct 1083; 94 L Ed 2d 244 (1987). If state law allows gaming but seeks to regulate it, the state is not authorized to enforce that law on Indian reservations. The *Cabazon* Court

4

made clear that regulation of Indian gaming is fundamentally the province of federal law. Tribes retain the exclusive right to regulate gaming on their lands in states where all gaming activity is not prohibited. *Id.* at 207.

In response to the *Cabazon* decision, Congress passed the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq*. With this act, Congress has provided a comprehensive federal regulation of tribal gaming. This framework allows state regulation only to the extent that it is negotiated into the terms of a tribal-state compact. Such a compact must set forth the parameters under which an Indian tribe will establish and operate casino-style gaming facilities. 25 USC 2710(d)(3).

IGRA provides that Indian tribes may engage in class III gaming only if "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ." 25 USC 2710(d)(1)(C). Because it is not classified as class I or class II style gaming, the casino-style gambling at issue in this case involves class III gaming. 25 USC 2703(8).

By allowing the states to play a role through the compacting process, IGRA "extends to the States a power withheld from them by the Constitution." *Seminole Tribe of*

*Florida v Florida*, 517 US 44, 58; 116 S Ct 1114; 134 L Ed 2d 252 (1996). IGRA does not furnish states with the ability to unilaterally regulate tribal gaming. Rather, it provides them an opportunity to oversee tribal gaming. The role of the state is limited to the terms the state is able to negotiate with a tribe.

IGRA requires a tribe to obtain a compact with a state in order to engage in casino-style gambling. A compact is

> [a]n agreement or contract between persons, nations or states. Commonly applied to working agreements between and among states concerning matters of mutual concern. A contract between parties, which creates obligations and rights capable of being enforced, and contemplated as such between the parties, in their distinct and independent characters. [Black's Law Dictionary (6th ed).]

States cannot prevent tribal gaming by refusing to negotiate or by demanding unreasonable conditions. They must negotiate in good faith upon a request by the tribe for such negotiation. 25 USC 2710(d)(3)(A). While *Seminole* held that Eleventh Amendment immunity protects states from suit by Indian tribes, it did not eliminate a state's duty to negotiate in good faith.

If a state refuses to engage in good-faith negotiations, it can lose its ability to influence the regulation of casino gaming on tribal land. The *Seminole* Court expressly refused to comment on substitute remedies

**6**

tribes might seek for a state's failure to negotiate in good faith. *Seminole, supra* at 76 n 18.[2]

According to IGRA:

Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity. [25 USC 2701(5).]

Michigan allows various forms of gambling. They include horse racing,[3] a state lottery,[4] and voter-approved casino gambling in the city of Detroit.[5] It cannot reasonably be argued that Michigan prohibits, rather than regulates, gambling. Therefore, Michigan's direct power

---

[2] I note that 25 USC 2710(d)(8) does not, as Justice Corrigan suggests, allow the tribe to go directly to the Secretary of Interior who can then approve the compact. The section simply gives the secretary the authority to approve a gaming compact entered into between an Indian tribe and a state. It does not authorize the secretary to approve a compact to which either side has not manifested its assent. After the *Seminole* case, the remedy for a tribe is unclear. Before *Seminole*, it was clear that the remedy was that each side would submit a proposed compact to a mediator, who would choose one of the two. 25 USC 2710(d)(7)(B)(iii). This remedy was available only after issuance of a federal district court order. *Id.* Because *Seminole* affirmed a state's immunity from federal suit, it is unclear if this remedy is still available.

[3] MCL 431.301 *et seq.*

[4] MCL 432.9.

[5] See MCL 432.201 *et seq.*

7

with respect to gambling in Indian country is the bargaining power given to it by the federal government through IGRA.

Relying on *Blank*, Justice Markman argues that the subject of the compacts, state oversight of tribal gaming, can be achieved only through legislation. This misconstrues the state's ability to pass laws applicable to Indians. It is a unique situation. "State law is generally not applicable to Indian affairs within the territory of an Indian tribe, absent the consent of Congress." Cohen's Handbook of Federal Indian Law, § 5.A.

The Michigan Gaming Control and Revenue Act[6] recognized this principle and provided that, in the future, Congress could delegate to the state jurisdiction over Indian gaming on Indian lands. But until or unless that occurs, the only way the parties can authorize Indian gaming is by mutually agreeing to a compact. Were this untrue, the Legislature could simply amend the gaming control act to unilaterally regulate gaming on tribal land.

Plaintiffs argue that 18 USC 1166 gives the state a regulatory role in tribal gaming without the need for a negotiated compact in which the tribe has ceded

---

[6] MCL 432.201 *et seq.*

**8**

jurisdiction. Plaintiffs misconstrue 18 USC 1166. This federal statute provides that state laws with respect to gambling apply in Indian country in the same manner in which they apply throughout the rest of the state. 18 USC 1166(a). At 18 USC 1166(d), it provides that

> [t]he United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior . . . has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.

Section d retains federal jurisdiction over Indian gaming unless a tribe negotiates it away in a compact. Without a compact, a state has no jurisdiction over gaming on Indian land. Hence, 18 USC 1166 does nothing more than adopt state law as the governing federal law for purposes of Indian gaming. *United Keetoowah Band of Cherokee Indians v Oklahoma*, 927 F2d 1170, 1177 (CA 10, 1991). Plaintiffs' arguments to the contrary are misguided.

IGRA allows tribes to engage in some forms of gambling. However, in recognition of the state's interest in the issue, IGRA requires a tribe to have a valid tribal-state gaming compact in place before it can engage in class III gambling. In exchange for giving states this power, IGRA requires the states to negotiate with tribes in good

faith. While IGRA provides for the negotiation of tribal-state compacts, it does not specify the manner in which a state must approve a compact. Therefore, one must consult state law to make this determination.

### III. The Role of State Law

The Michigan Constitution requires that "All legislation shall be by bill and may originate in either house." Const 1963, art 4, § 22. It further provides that, "No bill shall become a law without the concurrence of a majority of the members elected to and serving in each house." Const 1963, art 4, § 26. According to the Legislature's internal rules, concurrent resolutions need be approved only by a majority of those present at the time they are voted on. See *Mason's Manual of Legislative Procedure*, § 510(1) p 338.

If only a concurrent resolution is required, the tribal-state gaming compacts were properly approved and are valid. However, if the compacts are legislation, they were not properly approved by the Legislature, because a majority of those elected and serving did not approve them.

While the Michigan Constitution requires that all legislation be passed by bill, it does not define legislation. The dictionary defines "legislation" as "the act of making or enacting laws." *Random House Webster's*

**10**

*College Dictionary* (2000). "Law" is defined as "the principles and regulations established by a government or other authority and applicable to a people, whether by legislation or by custom enforced by judicial decision." *Id.*

A similar definition is found in Black's Law Dictionary (6th ed), which describes "legislation" as "[t]he act of giving or enacting laws. . . . Formulation of rule for the future." "Law" is further defined as "[t]hat which must be obeyed and followed by citizens subject to sanctions or legal consequences . . . ." *Id.*

These definitions suggest that legislation involves the Legislature's power to formulate rules applicable to its people. The central characteristic of legislation is the ability of the Legislature to act unilaterally in creating rules applicable to those subject to its power. In *Westervelt*,[7] a plurality of this Court stated, "[T]he concept of 'legislation', in its essential sense, is the power to speak on any subject *without any specified limitations*." (Emphasis in original). Where Indian gaming is concerned, the Legislature has no such power. According

---

[7] *Westervelt v Natural Resources Comm*, 402 Mich 412, 440; 263 NW2d 564 (1978) (opinion by Williams, J.).

to IGRA, the Legislature must obtain tribal consent before the tribe will be bound by state law.

The compacts are not legislation. They place no restrictions or duties on the people of the state of Michigan. They create no duty to enforce state laws on tribal lands. Sale of liquor to Indian casinos is subject to the same requirements as sales to other Michigan businesses.

The compacts do not impose duties, responsibilities, and costs on the state. They do not force the state to assume the obligation to oversee and implement the unemployment and worker's compensation statutes. The compacts merely obligate *the tribes* to provide the same benefits to their employees as those employees would be entitled to if they worked for an off-reservation business. A representative provision reads:

> The tribe shall provide to any employee who is employed in conjunction with the operation of any gaming establishment at which Class III gaming activities are operated pursuant to this Compact, such benefits to which the employee would be entitled by virtue of the Michigan Employment Security Act, and the Worker's Disability Compensation Act of 1969, if his or her employment services were provided to an employer engaged in a business enterprise which is subject to, and covered by, the respective Public Acts. [Compact with Little Traverse Band Bands of Odawa Indians, § 5. (internal citations omitted)].

**12**

There is no requirement in that representative provision that the tribe fulfill this obligation through state agencies. It is entirely possible that the tribe has its own system for providing such benefits.

Justice Weaver claims that the tribes have the authority to tax gaming activity under the IGRA. Opinion of Weaver, J., post at 8. We find the claim to be of no consequence in this case. That tribes may have relinquished certain rights as part of the bargaining process has no effect on the proper characterization of the compacts during review of the Legislature's actions.

A higher tax is not placed on Indian gaming proceeds. There is no restriction on advertising related to Indian casinos. The compacts do not give special treatment to Indian casino suppliers. No burden is placed on the people of the state of Michigan through the negotiated compacts.

Plaintiffs argue that the compacts mandate the creation of local revenue sharing boards. However, local governments are not obliged to create these boards unless they wish to take advantage of the monetary contribution the tribes have voluntarily agreed to provide. The compacts essentially assign third-party beneficiary status to local governments. In order to accept the benefits of a compact, a local government must comply with the conditions

**13**

set out in the compact. The compact, however, does not force a local government either to share in the benefits of the compact or to create a local board.

The compacts essentially advise local governments that, to exercise local control over the payments that the compacts obligate the tribes to disburse to them, they must establish a board. The board must be given the authority to accept the payments. The fact that local governments may exhibit rational self-interest and proceed to set up such boards does not render the compacts legislation. Nor does the fact that new businesses will be located on reservations near these communities render the subject of the compacts legislative. Any large business that locates a branch near a small community might increase local governmental expenses due to the enhanced economic activity that the branch occasions.

The compacts are applicable only to the tribes. The tribes are generally not subject to the legislative power of the state. To the extent that the compacts delineate rules of conduct applicable to tribal gaming, they do not do it through the use of the Legislature's unrestricted power. They do it through the affirmative choice of the tribes. The compacts are government-to-government

**14**

agreements. Black's, *supra* at 6.  Each explicitly acknowledges that it is between two sovereigns.

Accordingly, the compacts are not legislation. They are more closely analogous to contracts and have been so treated by other states. The Washington Supreme Court has held that "Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts." See *Confederated Tribes of the Chehalis Reservation v Johnson*, 135 Wash 2d 734, 750; 958 P2d 260 (1998).  See also *Confederated Tribes of Siletz Indians of Oregon v Oregon*, 143 F3d 481 (CA 9, 1998); *Gallegos v Pueblo of Tesque*, 132 NM 207, 218; 46 P3d 668 (2002).

As explained previously, the state does not possess the power to apply its law unilaterally to gaming on tribal land. The state and a tribe must negotiate a mutual agreement describing the regulations that may be applied to class III gaming on Indian lands.

The power to legislate is distinct from the power to contract. Whereas, normally, legislation requires only the agreement of a majority of the lawmakers, a contract must have the agreement of all its parties to all its terms. *Boerth v Detroit City Gas Co*, 152 Mich 654, 659; 116 NW 628 (1908). The compacts explicitly provide that they do not take effect unless all parties, the state and the tribes,

**15**

agree to them. The compacts are not a product of the unilateral action or unrestricted power of the Legislature, but, instead, result from negotiations between sovereign entities, the state and the tribes.

Because the compacts are not legislation, the Legislature was not required to approve them by bill. In Michigan, the "legislative authority of the State can do anything which it is not prohibited from doing by the people through the Constitution of the State or of the United States." *Huron-Clinton Metro Auth v Bds of Supervisors of Five Cos*, 300 Mich 1, 12; 1 NW2d 430 (1942), quoting *Attorney General v Montgomery*, 275 Mich 504, 538; 267 NW 550 (1936).

Nothing in the federal or state constitutions prohibits the Legislature from approving intergovernmental agreements by concurrent resolution. The Legislature's internal rules allow for this form of approval. Negotiated compacts might involve legislation, for example, where they require the state to create a new agency or extend state jurisdictional authority to tribal land. However, the compacts at issue do not involve these concerns.

The Legislature was not restricted in its approval process by IGRA or by the state constitution. Contrary to

Justice Markman's position,[8] our state constitution is unlike the federal constitution in this respect: whereas the power of the federal government is provided for and limited by the United States Constitution, the power of state government is inherent in the state. This distinction is well-recognized:

> The government of the United States is one of enumerated powers; the national Constitution being the instrument which specifies them, and in which authority should be found to the exercise of any power which the national government assumes to possess. In this respect, it differs from the constitutions of the several States, which are not grants of powers to the States, but which apportion and impose restrictions upon the powers which the States inherently possess. [Cooley, Constitutional Limitations, vol I, p 12.]

There is no provision in the state constitution indicating how the Legislature should address an executive agreement negotiated by the Governor and presented to the Legislature for its approval. Because there was no restriction on its ability to act, the Legislature followed its internal procedure, one that it used when approving compacts that the Governor negotiated in 1993. We conclude that, given the unique nature of tribal-state gaming

---

[8] Opinion of Markman, J., *post* at 38.

17

compacts and the content of the particular compacts at issue, this form of legislative approval was appropriate.

## IV. Separation of Powers

At the time that plaintiffs filed suit, no amendment of the compacts had been made. For that reason, it is arguable that plaintiffs' separation of powers claim is not ripe for review. If that is the case, plaintiffs' challenge is a facial challenge only.

To establish that an act is facially unconstitutional, the challenging party must show that "no set of circumstances exists under which the [a]ct would be valid." *Straus v Governor*, 459 Mich 526, 543; 592 NW2d 53 (1999), quoting *United States v Salerno*, 481 US 739, 745; 107 S Ct 2095; 95 L Ed 2d 697 (1987). Plaintiffs cannot meet this burden.

The amendment provision of the compacts survives a facial challenge to the Separation of Powers Clause of the Michigan Constitution. Const 1963, art 3, § 2. There are many conceivable amendments that a governor might make to these compacts. For example, a governor could amend the provision relating to dispute resolution or the provision about the timing of payments.

Because there was no amendment to challenge at the time plaintiffs brought suit, arguably the issue is not

**18**

ripe for review. Admittedly, the jurisprudence in this area is unclear. No controlling state precedent exists regarding when a court is to analyze the ripeness issue. Federal secondary authority suggests that a suit must be ripe when it is instituted: "[t]he doctrines of standing and ripeness focus on aspects of justiciability at the time the action is commenced." Moore's Federal Practice, vol 15, §101.05. In addition:

> The burden is on the plaintiff to allege in the complaint sufficient facts to establish the court's jurisdiction. The court will review the issue for ripeness as of the time the litigation is commenced. The matter must have been ripe for review at that time; subsequent ripening . . . is not sufficient to confer the court with jurisdiction that did not originally exist when the action was initiated." [*Id.* at § 101.74.]

Unfortunately, Moore's offers no authority for this proposition.

Clearly, during the pendency of this litigation, Governor Granholm made amendments to the gaming compacts at issue. It is argued that these render the issue ripe for this Court's review. However, the amendments were made after the opinions from the lower courts were released. This Court has consistently declined to entertain constitutional questions where it lacks the benefit of a fully developed lower court record. *In re CAW*, 469 Mich.

**19**

192; 665 NW2d 475 (2003); *Jenkins v Patel,* 471 Mich ___;
___ NW2d ___ (2004).

We may possess jurisdiction to decide the issue. However, the parties addressed the issue only in a cursory fashion, each premising its argument on its characterization of the original compacts as either legislation or contract. Also, the Court of Appeals did not address the issue. Absent a more developed record, in the exercise of judicial restraint, we decline to decide it.

Consistent with our practices, a majority of the Court agrees that the issue of whether the Governor's recent amendments violate the Separation of Powers Clause should be remanded for Court of Appeals consideration.

V. Local Acts Provision

Finally, because the compacts at issue are not legislation, they do not violate the local acts provision of the Michigan Constitution. Const 1963, art 4, § 29. We disagree with Chief Justice Corrigan's local acts analysis. The local acts provision reads:

> The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. [Const 1963, art 4, § 29.]

An act is legislation. Black's Law Dictionary defines a legislative act as: "[a]n alternative name for statutory law. A bill which has been enacted by the legislature into law." Black's Law Dictionary (6th ed). Since tribal-state gaming compacts are not legislation, as discussed *supra*, the local acts provision of our Constitution is not applicable to them.

### V. A response to the dissents

We are unpersuaded by Justice Markman's argument which has as its premise that *Blank* is applicable to the facts of this case. *Blank* involved a case where the Legislature delegated power to an administrative agency but attempted to retain a legislative veto. 462 Mich at 113. In contrast, the present case involves two separate branches of government approving agreements with sovereign Indian tribes. The question presented is whether the Legislature's ratification of the agreements by concurrent resolution was the appropriate manner in which to manifest its assent.

The extra-jurisdictional cases that the dissents rely on are distinguishable from the present case. In each, the governor of the state acted unilaterally to bind the state to the compact. While those cases hold that legislative approval is required, no case suggests the form that such approval must take. See *State of Kansas ex rel Stephan v*

**21**

*Finney*, 251 Kan 559; 836 P2d 1169 (1992); *Narragansett Indian Tribe of Rhode Island v Rhode Island*, 667 A2d 280 (1995). In the present case, the Michigan Legislature expressed its approval of the compacts. The unique question before us is whether that Legislature's approval was sufficient under the Michigan Constitution. We hold that it was.

Both Justice Markman and Justice Weaver rely on *Becker v Detroit Savings Bank*, 269 Mich 432, 257 NW 853 (1934). *Becker* is inapplicable to this case. It dealt with a legislative resolution that purported to convey to the courts the Legislature's intent in passing a certain law. The Court held that, while the resolution was entitled to "respectful consideration," it was not the law. *Id.* at 436. *Becker* concluded that the courts are bound to apply the law as written. *Id.*

The question here is not whether the compacts must be followed in light of conflicting statutory authority. It is whether the Legislature was required to voice its approval in the form of a bill that is passed into law. *Becker* notes that "[j]oint resolutions *** are often used to express the legislative will in cases not requiring a general law." *Id.* at 435, quoting *Hoyt v Sprague*, 103 US 613, 636; 26 L Ed 585 (1880). *Becker* does not aid in

**22**

determining whether the compacts at issue require a general law.

## VI. Conclusion

A majority of Justices, myself included, hold that the tribal-state gaming compacts at issue are not legislation. They are appropriately viewed as agreements between sovereign entities. They do not impose duties on or restrict the people of the state. Instead, they are contractual in nature, conveying the rights and obligations of the parties, the state, and the various tribes. Therefore, a concurrent resolution of the Legislature was appropriate to validate them.

For these reasons, a majority affirms the Court of Appeals decision in favor of defendants, except as to the recent amendments made by Governor Granholm. On that issue, a majority agrees to remand the case to the Court of Appeals for consideration of plaintiffs' separation of powers claim.

Marilyn Kelly
Michael F. Cavanagh

**23**

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

TAXPAYERS OF MICHIGAN AGAINST CASINOS,
AND LAURA BAIRD,

    Plaintiffs-Appellants,

v                                  No. 122830

THE STATE OF MICHIGAN,

    Defendant-Appellee,

and

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY, INC, IV, and GAMING
ENTERTAINMENT, LLC,

    Intervening Defendants-Appellees,

_____

WEAVER, J. *(concurring in part and dissenting in part).*

    I concur with the majority's holding that the compacts do not violate Const 1963, art 4, § 29, the "local acts" clause.[1]   But I dissent from the majority's decision that the tribal-state gaming compacts at issue, entered into and signed by various Indian tribes and Governor Engler on

_____

[1] The majority correctly holds that the "local act" provision of Michigan's constitution, art 4, § 29, is not implicated by the compacts; I concur in the majority's decision to affirm the decision of the Court of Appeals on this issue.

behalf of the state pursuant to the federal Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq.*, were validly approved by a joint resolution of the Legislature. Accordingly, I would hold that the compacts are void because they are legislation that is required to be enacted by bill, not passed by issuing a joint resolution, and I therefore would reverse the Court of Appeals decision on this issue.

I would also hold that the power to bind the state to a compact with an Indian tribe is an exercise of the legislative power, and that the Governor does not have the authority to bind the state to such a compact. Art 4, § 22 of the Michigan Constitution requires that "[a]ll legislation shall be by bill . . . ." A resolution is not a constitutional method of expressing the legislative will where that expression is to have the force of law and bind people other than the members of the house or houses adopting it. *Becker v Detroit Savings Bank,* 269 Mich 432, 434-435; 257 NW 855 (1934). The tribal-state compacts have the force of law and bind people other than the legislative members who adopted them. Therefore, the Legislature must exercise its power to bind the state to a compact with an Indian tribe by enacting a bill, not by passing a joint resolution. I would reverse the Court of

2

Appeals on this issue and hold that the compacts at issue are void.

Because I would hold that the compacts are void, it is unnecessary to remand to the trial court for consideration of whether the provision in the compacts that permits the Governor to amend the compacts without legislative approval violates Const 1963, art 3, § 2, the separation of powers doctrine. Such an issue is moot in light of my conclusion that the compacts are void.

I

The compacts at issue were signed by Governor Engler and the various Indian tribes, and approved by the Legislature pursuant to a joint resolution.[2] Appellants argue that the Legislature's approval by joint resolution was not valid. Appellants assert that the policy determinations in deciding whether and how to allow Indian tribes to operate casinos in Michigan are legislative in nature, and therefore the compacts must be approved by bill, not joint resolution, because the Michigan

---

[2] See House Concurrent Resolution (HCR) 115 (1998). While a bill must be passed by a majority of elected and serving members of the Legislature, a resolution may be passed by a majority vote of those legislators present at the time, as long as a quorum is present.

3

Constitution, art 4, § 22 requires that "[a]ll legislation shall be by bill."

Underlying the issue of whether the compacts were validly approved is a more fundamental question: who, under Michigan law, has the authority to bind the state of Michigan to a compact negotiated under IGRA. If the authority is vested in Michigan's Governor, the Governor's approval alone would be sufficient to render the compacts valid, there would be no requirement that the Legislature approve the compacts at all, and the manner in which the Legislature approved the compact would not be governed by the Constitution. See *Panzer v Doyle,* __ Wis 2d __, __; 680 NW2d 666 (2004). But if the authority to approve a compact is vested in Michigan's Legislature, then it is necessary to determine whether approval by resolution was a valid exercise of the Legislature's power under Michigan's Constitution.

II

IGRA does not specify which branch of a state government should bind the state to a compact with Indian tribes.[3] Rather, the determination whether a state has

---

[3] The IGRA provides, in pertinent part: "Any Indian tribe having jurisdiction over the Indian lands upon which
(continued…)

4

validly bound itself to a compact is a matter of state sovereignty and left to state law. *Saratoga Co Chamber of Commerce Inc v Pataki,* 100 NY2d 801, 822; 798 NE2d 1047 (2003). For the reasons set forth below, I would hold that it is the Legislature that has the authority to bind the state to a compact under IGRA and that the Governor does not have the authority to bind Michigan to a compact under IGRA.

Michigan's Constitution separates the powers of government: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. The executive power is vested in the Governor, Const 1963, art 5, § 1, and the legislative power is vested in a senate and a house of representatives. Const 1963, art 4 § 1. The executive power is, first and foremost, the power to enforce the laws or to put the laws enacted by the Legislature into effect. *The People ex rel Sutherland v*

---

(…continued)
a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities." 25 USC 2710(d)(3)(A).

*Governor,* 29 Mich 320, 324-325 (1874), *People ex rel Attorney General v Holschuh,* 235 Mich 272, 274-275; 209 NW 158 (1926); 16A Am Jur 2d, Constitutional Law § 258, p 165 and § 275, p 193. The legislative power is the power to determine the interests of the public, to formulate legislative policy, and to create, alter, and repeal laws. *Id.* The Governor has no power to make laws. *People v Dettenthaler,* 118 Mich 595; 77 NW 450 (1898). "[T]he executive branch may only apply the policy so fixed and determined [by the legislative branch], and may not itself determine matters of public policy or change the policy laid down by the legislature. 16 CJS Constitutional Law § 216, p 686.

As explained below, I conclude that binding the state to a compact with an Indian tribe involves determinations of public policy and the exercise of powers that are within the exclusive purview of the Legislature.

IGRA itself contemplates that states will confront several policy choices when negotiating tribal gaming compacts. *Saratoga Co Chamber of Commerce Inc v Pataki, supra* at 822. Under IGRA, a compact may include provisions relating to: (i) the application of directly related criminal and civil laws and regulations of the Tribe or the State; (ii) the allocation of jurisdiction between the

**6**

State and the Tribe to permit enforcement of such laws; (iii) State assessments to defray the costs of regulating gaming; (iv) taxation by the Tribe of such activity; (v) remedies for breach of contract; (vi) standards of operation for gaming and maintenance of gaming facilities; and (vii) "any other subjects that are directly related to the operation of gaming activities." 25 USC 2710 (d)(3)(C)(i)-(vii).

The Little River Band compact contains examples of policy decisions made for each of the seven issues recognized in 25 USC 2710(d)(3)(C)(i-vii). (i) Tribal law and regulations, not state law, are applied to regulate gambling.[4] But the compact applies state law, as amended, to the sale and regulation of alcoholic beverages encompassing certain areas. (section 10 [a], p 13). (ii) The tribe, not the state, is given responsibility to administer and enforce the regulatory requirements.

---

[4] The compact states, "Any limitations on the number of games operated or played, their location within eligible Indian lands as defined under this Compact, hour or period of operation, limits on wages or potsize, or other limitations shall be determined by duly enacted tribal law or regulation. Any state law restrictions, limitations or regulation of such gaming shall not apply to Class III games conducted by the tribe pursuant to this compact." (section 3[a][8], p 5 of the Little River Band compact).

(section 4[m][1], p 9).  (iii) To allow state assessments to defray the costs of regulating gaming, the compact states that the tribe shall reimburse the state for the costs up to $50,000 it incurs in carrying out functions that are authorized within the compact.  (section 4[m][5], p 10).  Also, the compact states that the tribe must pay 2% of the net win at each casino derived from certain games to the county treasurer.[5]   (section 18(a)(i), p 18).  (iv) Under IGRA the tribe could tax the gaming activity, but the compact does not allow such taxation.  (v) The compact provides for dispute resolution procedures in the event there is a breach of contract.  (p 11).  (vi)  The compact includes standards for whom a tribe can license and hire in connection with gaming, (section 4[d], p 6), sets accounting standards the gaming operation must follow, (p 7), and stipulates that gaming equipment purchased by the tribe must meet the technical standards of the state of Nevada or the state of New Jersey. (section 6[a], p 11).

---

[5] The compact states that it is the "States intent, in this and its other compacts with federally recognized tribes, that the payments to local governments provided for in this section provide financial resources to those political subdivisions of the State which actually experience increased operating costs associated with the operation of the class III gaming facility."  (section 18[a][ii], p 18).

(vii) The compact addresses the "other subjects that are directly related to the operation of gaming facilities" throughout the document. For example, it allows for additional class III games to be conducted through the agreement of tribe and the state. (section 3[b], p 5). Also, the compact states that the tribe must purchase the spirits it sells at the gaming establishments from the Michigan Liquor Control Commission and that it must purchase beer and wine from distributors licensed by the Michigan Liquor Control Commission. (section 10[b], p 13).

These compact provisions necessarily require fundamental policy choices that epitomize "legislative power." Decisions involving licensing, taxation, criminal and civil jurisdiction, and standards of operation and maintenance require a balancing of differing interests, a task the multi-member, representative Legislature is entrusted to perform under the constitutional separation of powers. See *Saratoga Co Chamber of Commerce v Pataki*, 100 NY2d 801, 822-823; 798 NE2d 1047; 766 NYS2d 654 (2003).

To date, every other state supreme court that has addressed whether the governor or the legislature of a state has the authority to bind the state to a compact with an Indian tribe under IGRA has concluded that the state's governor lacks the power unilaterally to bind the state to

**9**

tribal gaming compacts under IGRA. See *State ex rel Stephan v Finney,* 251 Kan 559; 836 P2d 1169 (1992); *State ex rel Clark v Johnson,* 120 NM 562; 904 P2d 11 (1995); *Narragansett Indian Tribe of Rhode Island v Rhode Island,* 667 A2d 280 (1995); *Pataki, supra;* *Panzer, supra.*[6] These cases concluded that entering into a tribal-state compact under IGRA, and thereby committing the state to a particular position with respect to Indian gaming, involves subtle and important decisions regarding state policy that are at the heart of legislative power. *Panzer, supra* at 62. Further, the cases have relied on the fact that their state constitutions, like Michigan's, provide for separation of powers, vesting the legislative power in the legislature and vesting the executive power in the governor. *Finney, supra* at 577; *Clark, supra* at 573; *Narragansett Indian Tribe, supra* at 280; *Pataki, supra* at 821-822; *Panzer, supra* at ___. The cases recognized that

_____

[6] A federal district court held that the governor of Mississippi did have the authority to bind the state to a compact with the Indian tribes, based on a Mississippi statute which authorizes the governor to transact business with other sovereigns, such as other states, territories, or the United States Government. *Willis v Fordice,* 850 F Supp 523 (1994). Unlike Mississippi, Michigan has no statutory or constitutional provision giving the Governor authority to bind the state in a compact with an Indian tribe.

**10**

the legislature creates the law, that the governor executes the laws, and that a compact with an Indian tribe did not execute existing law, but was, instead, an attempt to create new law. *Finney, supra* at 573, and *Clark, supra* at 573. The courts also focused on the balance that the compact struck on matters of policy such as the regulation of class III gaming activities, the licensing of its operators, and the respective civil and criminal jurisdictions of the state and the tribe necessary for the enforcement of state or tribal laws or regulations. *Clark, supra* at 574; *Pataki, supra* at 822; *Panzer, supra* at ___.

The approval of a compact with an Indian tribe involves numerous policy decisions. The executive branch does not have the power to make those determinations of public interest and policy, but may only apply the policy as fixed and determined by the legislature. I would agree with the other state courts that have examined this issue, and hold that committing the state to the myriad policy choices inherent in negotiating a gaming compact constitutes a legislative function. Thus, the Governor does not have the authority to bind the state to a compact with an Indian tribe; only the Legislature does.

Having determined that binding the state to a compact is a legislative function, the question then becomes whether the Legislature may do so by a joint resolution. I would conclude that it may not because under the Michigan Constitution a resolution is not a valid exercise of the legislative power.

The Michigan Constitution requires that "[a]ll legislation shall be by bill . . . ." Const 1963, art 4, § 22. This Court has previously recognized that "[a] mere resolution, therefore, is not a competent method of expressing the legislative will, where that expression is to have the force of law, and bind others than the members of the house or houses adopting it." *Becker v Detroit Savings Bank,* 269 Mich 432, 434-435; 257 NW 855 (1934).

In the 1997-1998 term there were 117 concurrent resolutions introduced in the House of Representatives. Approximately 23 concurrent resolutions were adopted, including HCR 115, which approved the compacts at issue. The other 22 concurrent resolutions adopted included resolutions commemorating the 150th anniversary of the selection of the city of Lansing as the permanent capital of the state of Michigan [HCR 24]; urging the President of the United States to designate the Detroit River as an

**12**

American Heritage River [HCR 69]; prescribing the legislative schedule [HCR 74 & HCR 113]; and renaming the Michigan Civilian Conservation Corps' Camp Vanderbild in the honor of State Representative Tom Mathieu [HCR 117].

A joint resolution is not an act of legislation, and it cannot be effective for any purpose for which an exercise of legislative power is necessary. *Cleveland Terminal & Valley RR Co v State,* 85 Ohio St 251, 293; 97 NE 967, 973 (1912). In issuing the joint resolution approving of the compacts in the instant case, the Legislature purported to bind the entire state to the policy decisions of and the terms set forth in the compacts, which would be in place for at least twenty years. This was not a valid exercise of the legislative power, because art 4, § 22 requires that legislation be by bill.

### Conclusion

I would hold that the power to bind the state to a compact with an Indian tribe is an exercise of the legislative power, and that that the Legislature must exercise its power to bind the state by enacting a bill, not by passing a joint resolution. Accordingly, I would conclude that the compacts are void, and I would reverse the decision of the Court of Appeals on that issue. Because I would hold that the compacts are void, it is

**13**

unnecessary to address whether the provision that permits the Governor to amend the compacts is unconstitutional.

Elizabeth A. Weaver

S T A T E   O F   M I C H I G A N

SUPREME COURT

TAXPAYERS OF MICHIGAN AGAINST CASINOS,
AND LAURA BAIRD,

    Plaintiffs-Appellants,

v                                                        No. 122830

THE STATE OF MICHIGAN,

    Defendant-Appellee,

and

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY, INC, IV, and GAMING
ENTERTAINMENT, LLC.,

    Intervening Defendants-Appellees,
_____

MARKMAN, J. (*concurring in part and dissenting in part*).

    I respectfully dissent from the lead opinion, except as to part VI thereof, in this declaratory action in which we granted leave to appeal to consider: (1) whether the tribal-state gaming compacts at issue, entered into and signed by various Indian tribes and Governor Engler on behalf of the state pursuant to the federal Indian Gaming Regulatory Act, 25 USC 2701 *et seq.*, constitute "legislation" such that Michigan's Legislature violated Const 1963, art 4, § 22 when it approved them by resolution

rather than by bill; (2) whether the provision in the compacts that purports to empower the Governor to amend them without legislative approval violates Const 1963, art 3, § 2, the separation of powers doctrine; and (3) whether the compacts violate Const 1963, art 4, § 29, the "local acts" clause.

Regarding the first issue, the circuit court concluded that the compacts constitute legislation and, therefore, the Legislature was required to adopt them by bill. The Court of Appeals disagreed and reversed the decision of the circuit court. In my judgment, the compacts constitute legislation and, therefore, the Legislature violated art 4, § 22 when it adopted them by a resolution vote. Accordingly, I dissent from the lead opinion, and I would reverse the decision of the Court of Appeals on this issue and reinstate the decision of the circuit court.

Regarding the second issue, the circuit court concluded that the compacts violate art 3, § 2. The Court of Appeals reversed the decision of the circuit court on the basis that this issue was not ripe for review because the Governor had not yet attempted to amend the compacts. However, Governor Granholm recently sought to amend one of the four compacts and, therefore, in my judgment, this issue is ripe. I conclude that the amendatory provision

2

violates art 3, § 2 and, therefore, I dissent from the lead opinion on this issue.

Regarding the third issue, the circuit court concluded that art 4, § 29 is not implicated. The Court of Appeals agreed and affirmed the decision of the circuit court. I concur with the analysis set forth in part VI of the lead opinion finding that art 4, § 29 is not implicated and, accordingly, I would affirm the decisions of the lower courts on this issue.

## I.    BACKGROUND

In *California v Cabazon,* 480 US 202; 107 S Ct 1083, 94; L Ed 2d 244 (1987), the United States Supreme Court considered whether California could legally enforce its regulatory gambling laws on Indian reservations if the state did not completely prohibit such gambling.[1] While the Court affirmed that it "has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' . . . and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States,'" it also acknowledged

---

[1] If the state *prohibited* class III gaming within its borders, *Cabazon* held that California could enforce its criminal laws relating to that prohibition on Indian lands through 18 USC 1162.

3

that "[i]t is clear . . . that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided." *Id.* at 207.[2] Thus, the question to resolve in *Cabazon* was whether the Congress had expressly provided that state laws that regulate, but do not prohibit, gambling may be applied on Indian reservations. The Court answered that question in the negative and, accordingly, held that California had no legal right to enforce those laws on reservations.

In response to *Cabazon,* the Congress, in 1988, passed the Indian Gaming Regulatory Act, 25 USC 2701 *et seq.* (IGRA). The United States District Court for the District of South Dakota in *Cheyenne River Sioux Tribe v South Dakota,* 830 F Supp 523, 526 (D SD, 1993), aff'd 3 F3d 273 (CA 8, 1993), stated:

> The IGRA was enacted in response to the Supreme Court's decision in *Cabazon.* Congress wished to give states a certain amount of input into gambling on Indian reservations. S. Rep. No. 446, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071.

---

[2] Additionally, the Court in *Cabazon* held that "[under] . . . exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members" even absent express Congressional consent. *Cabazon, supra* at 215. However, the Court resolved that tribal gambling was not an area encompassing such "exceptional circumstances" so as to "escape the preemptive force of federal and tribal interests . . . ." *Id.* at 221.

4

The IGRA gives states the right to get involved in negotiating a gaming compact because of the obvious state interest in gaming casino operations within the state boundaries . . . .[3]

IGRA divides gaming activities into three classes. Class I gaming consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."  25 USC 2703(6). Class II gaming includes bingo and card games—other than banking card games—that are played in conformance with state laws and regulations regarding hours of operation and limitations on wagers or pot sizes.  25 USC 2703(7).  Class III gaming includes all other forms of gambling.  25 USC

---

[3] See also *United States v Santa Ynez Band of Chumash Mission Indians*, 983 F Supp 1317, 1323 (CD Cal, 1997) ("In [*Cabazon*]*,* the Supreme Court sharply limited the power of states to apply their gambling laws to Indian gaming. An essential element of its decision was that Congress had not acted specifically to make state gambling laws applicable in Indian country. This decision made clear that it would require a new act of Congress for states to have any effective ability to prevent or regulate Indian gaming. IGRA was enacted in direct response to *Cabazon*. . . . Subsection (a) of § 1166 expressly makes state gambling laws applicable in Indian country. . . .")  See also *Confederated Tribes of Siletz Indians of Oregon v United States,* 110 F3d 688, 692 (CA 9, 1997)*; Pueblo of Santa Ana v Kelly,* 104 F3d 1546, 1548 n 3 (CA 10, 1997); *Cheyenne River Sioux Tribe v South Dakota,* 830 F Supp 523, 525-526 (D SD, 1993), aff'd 3 F3d 273 (CA 8, 1993).

5

2703(8).

At issue in this case is class III gaming, referred to throughout the remainder of this opinion as "gambling" or "casino gambling." 18 USC 1166 provides a starting point to IGRA as it relates to gambling. It states:

> (a) Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.

> (b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

> (c) For the purpose of this section, the term "gambling" does not include—

> (1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or

> (2) class III gaming conducted under a Tribal-State compact approved by the Secretary of the Interior under [25 USC 2710(d)(8)] of the Indian Gaming Regulatory Act that is in effect.

> (d) The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country . . . .

**6**

Thus, IGRA generally provides that in the absence of a tribal-state compact, for purposes of federal law, all state gambling laws, including regulatory, as well as prohibitory, laws and regulations and any relevant criminal punishments, apply on Indian land just as they apply elsewhere in the state, albeit with the proviso that criminal prosecutions are within the jurisdiction of the federal government.[4]

---

[4] It appears that states have some enforcement powers under § 1166(a)—civil enforcement powers. See *Santa Ynez Band, supra* at 1322:

> Consideration of the structure of § 1166 suggests strongly that Congress intended to distinguish civil enforcement to prevent future acts of non-conforming gaming from criminal enforcement efforts to punish past acts. As to the latter, § 1166(b) and (d) leave no doubt that criminal enforcement is the exclusive province of the United States. The United States contends that Congress also intended for it to have the same exclusive power to bring civil enforcement actions under § 1166(a). The statute says nothing at all to suggest this. On the contrary, the more natural inference to be drawn from Congress' decision to make state law applicable, as such, in § 1166(a), rather than to convert it to federal law as in § 1166(b), is that Congress intended to divide the enforcement of the two subsections between the states and the United States.
>
> If Congress had not intended § 1166(a) to be used by the states for civil enforcement of the state laws made applicable by it, there was no need first to make all state gambling laws applicable, as such, and then to carve out only

(continued…)

7

If a tribe wishes to "opt-out" of the default federal law rule of § 1166 and to lawfully engage in casino gambling on its Indian land, it may do so in accordance with 25 USC 2710(d) of IGRA. That section provides, in relevant parts:

> (1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
>
> * * *
>
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
>
> (C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.
>
> * * *
>
> (3)(A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.[5]

---

(…continued)
> those acts which would be punishable under state law and redefine them as identical, independent federal offenses [under § 1166(b)].

[5] In 1996, the United States Supreme Court somewhat limited the reach of IGRA in *Seminole Tribe of Florida v Florida*, 517 US 44; 116 S Ct 1114; 134 L Ed 2d 252 (1996).

(continued…)

\* \* \*

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

---

(…continued)

In *Seminole Tribe*, the Court considered 25 USC 2710(d)(7) of IGRA, a provision that permits Indian tribes to sue a state in federal court when that state has refused to negotiate in good faith for a tribal-state compact. The Court ruled that this provision violates state sovereign immunity as preserved by the Eleventh Amendment of the United States Constitution and is therefore unconstitutional.

* * *

(5) Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any Tribal—State compact entered into by the Indian tribe under paragraph (3) that is in effect.

Thus, under § 2710(d), a state and a tribe are encouraged to negotiate with one another with the ultimate goal of entering into a mutually agreeable tribal-state compact that makes gambling on that tribe's lands lawful and that may alter the general gambling laws and regulations and enforcement procedures that otherwise apply to that tribe through § 1166.

In essence, by providing under § 1166 that, in the absence of a compact, state gambling laws and regulations apply on Indian land, the Congress provided the consent to the states that was found lacking in *Cabazon* to regulate tribal gambling in the same manner and to the same extent that states regulate gambling elsewhere within their borders.[6]  However, to maintain the proper balance between

---

[6] For example, if state law provides that casino gambling anywhere in the state is prohibited and punishment for illegal casino gambling is imprisonment of five years and a fine of $10,000, that is the law that applies to

(continued…)

Indian and state affairs, the Congress further provided under § 1166 that the federal government is charged with enforcing state criminal gambling laws and regulations on Indian land.

This point was succinctly made by the United States Court of Appeals for the Ninth Circuit in *Artichoke Joe's California Grand Casino v Norton,* 353 F3d 712, 721-722 (CA 9, 2003). There, the court addressed the role of IGRA and, of particular relevance, 18 USC 1166, insofar as that provision grants states the power to generally regulate gambling on Indian land. The court stated:

> IGRA changed the landscape . . . . [I]t devised a method to give back some of the *regulatory* [italics in original] authority that the Supreme Court had held inapplicable to Indian lands in *Cabazon.* One of the bases of the holding

---

(…continued)
tribal lands under § 1166 in the absence of a compact. If the state decides at some later point, perhaps because of a large illegal gambling problem specifically on tribal lands, to amend its laws to hold that gambling is still entirely prohibited, but that the punishment is now imprisonment of twenty-five years and a $200,000 fine, *that* amended law becomes the law that is applicable to tribal lands under § 1166 in the absence of a compact. Thus, by making state gambling laws—whatever those laws are at a given time—applicable to Indian land in the absence of a compact, IGRA gives states meaningful regulatory authority over casino gambling on Indian land. Therefore, Chief Justice Corrigan is incorrect when she states that "states have no authority to regulate tribal gaming under IGRA unless the tribe explicitly consents to the regulation in a compact." *Ante* at 11.

in *Cabazon* was that Congress had not explicitly ceded regulatory authority for gaming to the states in Public Law No. 280 or otherwise. IGRA responded by creating a statutory basis for gaming regulation that introduced the compacting process as a means of sharing with the states the federal government's regulatory authority over class III gaming. Simultaneously, IGRA put into effect 18 USC 1166, which provides that "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State."  18 USC 1166(a). The federal government retained the power to prosecute violations of state gambling laws in Indian country, so as to preserve the delicate balance of power between the States and the tribes.  *However, the fact that the federal government retained that power does not change the fact that California may enact laws and regulations concerning gambling that have an effect on Indian lands via § 1166.  [Artichoke Joe's, supra* at 721-722 (citations omitted; emphasis added).][7]

Moreover, through § 2710(d), the Congress provided the states with a direct means of "escap[ing] the preemptive

_____

[7] See also *Sycuan Band of Mission Indians v Roache*, 788 F Supp 1498, 1506 (SD Cal, 1992), aff'd 54 F3d 535 (CA 9, 1994) ("The balance struck by Congress under the IGRA appears to be that the state laws governing gaming apply, for the most part, with the same force and effect the laws would have elsewhere in the state. Thus, by federalizing state law, the states could generally define the boundary between legal and illegal gaming, and could be assured that activities that would be illegal if performed outside the reservation boundaries would also be illegal within the reservation boundaries.")

force of federal and tribal interests"[8] regarding class III gaming on Indian land by granting states the power to *specifically* make lawful and regulate casino gambling on particular Indian land, as long as such actions arise from the negotiation process and are otherwise in accordance with IGRA.

In 1993, Governor Engler, pursuant to § 2710(d) of IGRA, entered into tribal-state compacts with seven Michigan tribes that were already conducting class III gambling before the Congress's passage of IGRA.[9] As required by the terms of a consent judgment that resolved a federal lawsuit filed by the tribes against the Governor to compel negotiations, the compacts were approved by the Legislature by resolution and became effective.[10]

---

[8] *Cabazon, supra* at 221.

[9] These tribes were the Sault Ste. Marie Tribe of Chippewa Indians, the Grand Traverse Band of Ottawa and Chippewa Indians, the Keweenaw Bay Indian Community, the Hannahville Indian Community, the Bay Mills Indian Community, the Lac Vieux Desert Band of Lake Superior Chippewa Indians, and the Saginaw Chippewa Indian Tribe. All these tribes are currently operating casinos.

[10] After IGRA was passed, the tribes that were already engaged in casino gambling in Michigan requested that the Governor negotiate gaming compacts. The negotiations stalled and the tribes filed suit in federal court to compel negotiations. See *Sault Ste Marie Tribe v Engler,* 93 F Supp 2d 850 (WD Mich, 2000). During this litigation, the parties reached a settlement and the Court entered a
(continued…)

**13**

Additional state court litigation followed in which the Michigan Court of Appeals twice confirmed that the Governor did not violate the separation of powers clause by binding the state to tribal-state compacts where the Legislature had approved those compacts by resolution.  Thus, the Court of Appeals implied that mere resolution approval by the Legislature of tribal-state compacts was proper.  See

---

(…continued)

consent judgment.  Essentially, the consent judgment is constituted of the seven 1993 compacts entered into by Governor Engler and the tribes in accord with the settlement.  This consent judgment should not be interpreted as a federal court determination that a resolution vote is a proper adoption because the court did not address this question; it merely incorporated into the consent judgment the terms of the settlement as agreed to by Governor Engler and the tribes.  Moreover, the United States Court of Appeals for the Sixth Circuit, in *Keweenaw Bay Indian Community v United States,* 136 F3d 469, 477 (1998), in which the court addressed an issue pertaining to one of the 1993 consent judgment compacts (but not the issue implicated in this case), stated:

> Regarding obtaining the Michigan Governor's "approval" twice, we point out that a governor's endorsement of a compact as required by the terms of a compact is coincidental, varied and dependent on the relevant state laws. *See, e.g.,* [*Pueblo of Santa Ana v Kelly,* 104 F3d 1559 (CA 10, 1997)], cert den 522 US 807 [118  S Ct 45; 139  L Ed 2d 11] (1997) (deciding that Governor of New Mexico lacked authority, under New Mexico Constitution or state statute, to bind state to tribal-state compacts).

Thus, the Sixth Circuit expressly recognized that a governor might not have the power to bind the state to an IGRA compact and that the question is a matter of state law.

**14**

*McCartney v Attorney General,* 231 Mich App 722, 728; 587 NW2d 824 (1998); *Tiger Stadium Fan Club v Governor*, 217 Mich App 439; 553 NW2d 7 (1996).

The compacts at issue in this case were first signed by Governor Engler and each of four different Indian tribes in January of 1997.[11]  Each compact was to take effect, according to a compact provision, after "[e]ndorsement by the Governor of the State and concurrence in that endorsement by resolution of the Michigan Legislature."[12] The compacts were modified and re-executed in December 1998, and the Legislature proceeded to consider them by resolution.  See HCR 115 (1998).  Unlike a bill, which must be passed by a majority of elected and serving members of the Legislature, a resolution may be passed by a majority vote of those legislators present at the time, as long as a quorum is present.  The House of Representatives approved the compacts by a resolution vote of 48 to 47, and the Senate followed suit by a resolution vote of 21 to 17.

---

[11] These tribes are the Little Traverse Bay Band of Odawa Indians, the Pokagon Band of Ottawa Indians, the Little River Band of Ottawa Indians, and the Nottawaseppi Huron Potawatomi.  Of these tribes, the Little Traverse Bay Band and the Little River Band are currently operating casinos.

[12] See § 11 of the compacts.

**15**

Following is a list of the essential compact terms:

- The compacts permit a variety of gambling activities.

- The compacts provide that the tribe and the Governor may subsequently agree to expand the list of class III gaming activities permitted by the compacts.

- The compacts provide that the tribe shall "enact a comprehensive gaming regulatory ordinance" but if any regulation imposed by the tribe is less stringent than that imposed by the compact, the compact governs.

- The compacts provide that the tribe shall have responsibility to administer and enforce applicable regulatory requirements.

- The compacts provide limitations on the tribe's hiring practices, for example, the tribe may hire no one under age 18 (whereas non-Indian casinos in Michigan may employ only those who are 21 or older).

- The compacts allow persons aged 18 and over to gamble (whereas the age requirement in the rest of Michigan is 21).

- The compacts incorporate the protections of the Michigan Employment Security Act, MCL 421.1 *et seq.;* and the Worker's Disability Compensation Act of 1969, MCL 418.101 *et seq.*

- Any disputes between the tribe and the state are to be resolved through binding arbitration.

- The tribe must post a sign in the gaming facility noting that the facility "is not regulated by the State of Michigan."

- The compact is binding for a period of twenty years after it becomes effective.

- The tribe must make semi-annual payments of

8% of the net win at the casino to the Michigan Strategic Fund.

- The tribe must make semi-annual payments of 2% of the net win to the treasurer of the relevant county to be held by the treasurer on behalf of the Local Revenue Sharing Board. To this end, counties in the vicinity of the class III gaming facilities shall create a Local Revenue Sharing Board.

- The compacts contain a provision that purports to empower the Governor to amend them without legislative approval.

Various lawsuits were filed questioning the validity of the 1998 compacts. The Sault Ste. Marie Tribe of Lake Superior sued in federal court to enjoin the operation of the new casinos, but the United States Court of Appeals for the Sixth Circuit dismissed this suit on standing grounds. *Sault Ste. Marie Tribe v United States*, 288 F3d 910 (CA 6, 2002). Two state legislators also challenged the approval of Michigan's 1998 compacts by the Secretary of Interior, which suit was also dismissed on standing grounds by the United States Court of Appeals for the Sixth Circuit. *Baird v Norton,* 266 F3d 408 (CA 6, 2001).

Plaintiffs-appellants, the Taxpayers of Michigan Against Casinos and Laura Baird, filed this suit against Michigan in the Ingham Circuit Court seeking a declaratory judgment that the compacts do not comport with various constitutional provisions. Plaintiffs contend first that the compacts amount to legislation and, therefore, pursuant

**17**

to Const 1963, art 4, § 22 the Legislature was required to adopt them by bill rather than approve them by resolution. The circuit court held that the compacts should have been approved by bill. The Court of Appeals reversed the circuit court decision, concluding that the compacts do not constitute legislation because they contain no enforcement provision that would ensure that their terms are satisfied and because the power of the state to legislate in this area is preempted by federal law. The Court of Appeals opined that the compacts constitute mere contracts and, therefore, approval by resolution was not constitutionally infirm. Plaintiffs also contend that the provision in the compacts that purports to empower the Governor to amend them without legislative approval violates Const 1963, art 3, § 2, the "separation of powers" doctrine. The circuit court agreed with plaintiffs. The Court of Appeals, however, reversed the decision of the circuit court on the basis that the amendatory provision issue was not ripe for review because the Governor had not yet attempted to amend the compacts. Plaintiffs additionally contend that the compacts violate Const 1963, art 4, § 29, the "local acts" clause. The circuit court disagreed, holding that art 4, § 29 is not implicated. The Court of Appeals agreed and affirmed the circuit court on this issue.

## II. STANDARD OF REVIEW

Matters of constitutional and statutory interpretation are reviewed de novo by this Court. *Harvey v Michigan,* 469 Mich 1, 6; 664 NW2d 767 (2003); *Roberts v Mecosta Co Gen Hosp,* 466 Mich 57, 62; 642 NW2d 663 (2002).

## III. ANALYSIS

This Court has been called upon to consider, in this action seeking declaratory judgment, matters of significant constitutional concern. We are asked to consider whether the challenged tribal-state compacts and various actions undertaken by our legislative and executive branches of government pertinent to those compacts are consistent with the enactment requirement, the separation of powers doctrine, and the local acts provision embodied in Michigan's Constitution. "[D]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." House Speaker v Governor, 443 Mich 560, 575; 506 NW2d 190 (1993).

### A. DO COMPACTS CONSTITUTE "LEGISLATION"?

The first question presented on review requires that

**19**

we consider whether the tribal-state compacts at issue constitute "legislation." The Michigan Constitution requires that "[a]ll legislation shall be by bill . . . ." Const 1963, art 4, § 22. In addition, "[n]o bill shall become a law without the concurrence of a majority of the members elected to and serving in each house." Const 1963, art 4, § 26. Plaintiffs contend that the compacts constitute legislation and, therefore, the Legislature was required to approve them by bill—by a majority vote of the members elected to and serving in each house. Defendants contend that the compacts do not constitute legislation and instead are contracts of a unique nature that the state may validly enter into pursuant to federal law as provided in IGRA and, therefore, the compacts are not subject to Const 1963, art 4, §§ 22 and 26.

Black's Law Dictionary (7th ed) defines "legislation" as "[t]he process of making or enacting a positive law in written form, according to some type of formal procedure, by a branch of government constituted to perform this process-Also termed *lawmaking* . . . ." Michigan's Constitution provides that "[t]he legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. Thus, the branch of government "constituted to perform [the

lawmaking] process" is the Legislature, and the "formal procedure" by which this process is to occur is constitutionally defined—lawmaking is to be "by bill" and is subject to a majority vote of those elected to each house of the Legislature. Const 1963, art 4, §§ 22 and 26. Accordingly, the definition of "legislation" in Black's Law Dictionary requires that we consider whether the compacts amount to "positive lawmaking."

In *Blank v Dep't of Corrections,* 462 Mich 103; 611 NW2d 530 (2000), this Court considered whether a provision in the Administrative Procedures Act, MCL 24.201 *et seq.,* that required administrative agencies to obtain the approval of a joint committee of the Legislature or the Legislature itself before enacting new administrative rules violated the enactment and presentment requirements of Michigan's Constitution, Const 1963, art 4, §§ 26 and 33.[13]

In analyzing the question presented in *Blank*, we addressed whether the challenged action—a vote of the joint committee or the Legislature itself on an administrative rule—was "legislative" in nature, so that it was subject, under the enactment and presentment requirements of

_____

[13] The differences between the two concurring opinions in *Blank* and the majority opinion are not pertinent to the analysis of *Blank* as set forth in this opinion.

**21**

Michigan's Constitution, to a majority vote of the full Legislature and gubernatorial approval.[14]

In resolving that question, we employed the analytical framework laid out by the United States Supreme Court in *Immigration & Naturalization Service v Chadha,* 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983). As we noted in *Blank,* the United States Supreme Court in *Chadha* made four observations in determining that the action challenged in that case was inherently legislative and was subject to the enactment and presentment requirements of the United States Constitution:

> First, the action "had the purpose and effect of altering ... legal rights, duties and relations of persons ... outside the legislative branch." Second, the action supplanted legislative action. The only way the House could have obtained the same result would have been by enacting legislation. Third, the House's action involved determinations of policy. Fourth, the constitution explicitly authorizes only four instances where one house of Congress can act alone. It does not include the authority for one house to exercise a legislative veto over duly authorized actions of the executive branch.

---

[14] In this case, the presentment requirement embodied in Michigan's Constitution, Const 1963, art 4, § 33, requiring that laws enacted by the Legislature be approved by the Governor before taking effect, is not at issue because the Governor signed the compacts. Thus, the issue, as noted, is whether the compacts violate the enactment requirements of Const 1963, art 4, § 26 because they constitute legislation.

[*Blank, supra* at 114, quoting *Chadha, supra* at 952-956 (citations omitted).]

Applying *Chadha's* framework in *Blank*, this Court held that the challenged action was "legislative" in nature and, therefore, it was subject to the enactment and presentment requirements of Michigan's Constitution.

Because the *Chadha/Blank* framework provides necessary guidance in determining whether a challenged action constitutes "legislation" subject to the constitutional enactment requirements, I employ it in the context of this case.[15]  Accordingly, in my judgment, we must consider: (1) whether the compacts at issue "'had the purpose and effect

---

[15] Chief Justice Corrigan determines that the *Chadha/Blank* framework is not applicable to this case, despite the fact that the issue in this case is whether a certain deliberate act undertaken by a branch of our government violates the Constitution because the substance of the act constitutes "legislation," and this is specifically the issue that was addressed in *Chadha* and *Blank.*  She contends that the *Chadha/Blank* framework is inapplicable because this case concerns IGRA compacts and not a legislative veto power and "our Constitution is silent regarding the proper form of legislative approval of tribal-state gaming compacts under IGRA. . . ." *Ante* at 25.  However, the point of invoking *Chadha/Blank* is only to determine whether the compacts amount to legislation.  If they do, Const 1963, art 4, § 22 and § 26 require that they be subject to bill-making approval.  She tautologically surmises that the *Chadha/Blank* framework is not relevant because the compacts do not constitute legislation, but the very point of utilizing the *Chadha/Blank* framework is to determine *whether* the compacts constitute legislation.  If so, then our Constitution is *not silent* on this issue.

of altering . . . legal rights, duties and relations of persons . . . outside the legislative branch,'" *Blank, supra* at 114; (2) whether the Governor's action in negotiating the compacts and the Legislature's resolution vote on the compacts supplanted legislative action; (3) whether the compacts involved determinations of policy; and (4) whether Michigan's Constitution explicitly authorizes the Legislature to approve these compacts by a resolution vote even if they otherwise constitute "legislation."

### i. LEGAL RIGHTS, DUTIES AND RELATIONS

The first factor, whether the compacts had the purpose and effect of altering legal rights, duties, and relations of persons outside the legislative branch, i.e., whether they have a general effect upon the citizens of Michigan, addresses essentially the same question as does the definition of "legislation" in Black's Law Dictionary. That is, Black's primarily defines "legislation" as the making of positive law, and when an action has the purpose and effect of altering legal rights, duties, and relations of persons outside the legislative branch, that action is typically an exercise in positive lawmaking.

What is important to understand is that, in the absence of the challenged tribal-state compacts, gambling on the subject Indian land was *unlawful*. Gambling in the

absence of a compact was unlawful pursuant to 18 USC 1166, which, as noted above, provides that, in the absence of a tribal-state compact, state laws regulating or prohibiting gambling "*shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State*," albeit, at least for criminal laws, through federal enforcement.  18 USC  1166(a).  Casino gambling in Michigan is generally unlawful.   MCL  750.301.   The *only* casino gambling that is authorized in Michigan is that gambling conducted in accordance with the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq.*  However, by its express terms, the MGCRA *does not apply to "gambling on Native American land."*  MCL 432.203(2)(d),(5).  Thus, casino gambling on Indian land cannot be authorized and conducted pursuant to the MGCRA, which leads to the inescapable conclusion that casino gambling on Indian lands located in Michigan is, pursuant to § 1166, subject to Michigan's general prohibition against such gambling.[16]

---

[16] Moreover, I find to be of significance the fact that MCL 432.203 not only expressly provides that the MGCRA is inapplicable to casino gambling on Indian lands, but it also provides:

> If a federal court or agency rules or federal legislation is enacted that allows a state to regulate gambling on Native American land or land held in trust by the United States

(continued…)

**25**

Accordingly, under § 1166, in the absence of a tribal-state compact, casino gambling on Indian land within Michigan's borders is unlawful, and that general unlawfulness is to be enforced by the federal government.[17]

(…continued)
> for a federally recognized Indian tribe, the legislature shall enact legislation creating a new act consistent with this act to regulate casinos that are operated on Native American land or land held in trust by the United States for a federally recognized Indian tribe. The legislation shall be passed by a simple majority of members elected to and serving in each house. [MCL 432.203(5).]

Thus, within the framework of the MGCRA, the Legislature apparently recognized that if Michigan is granted the right to regulate gambling on Indian lands within Michigan's borders, such ensuing regulation would be "legislative" in nature and would require legislative action in accordance with the enactment requirement of Const 1963, art 4, § 26. In fact, the MGCRA *requires* that the Legislature pass legislation regulating gambling on Indian lands if federal law so permits. It is clear, in my judgment, that IGRA grants states, through both § 1166 and the compacting process of § 2710(d), a means of regulating gambling on Indian lands. Accordingly, pursuant not only to Const 1963, art 4, §§ 22 and 26, but also pursuant to the Legislature's own self-imposed mandate in MCL 432.203(5), the compacts, because they represent federally permitted state regulation of gambling on Indian lands, should have been passed by a majority of those elected to and serving in each house.

[17] My colleagues in the majority, in my judgment, simply ignore the relevance of § 1166 in determining the lawfulness, in the absence of a compact, of casino gambling on Indian land. They do this by summarily noting and relying on the fact that it is the federal government that is charged under § 1166 with enforcing the applicable state law regulations. Opinion of Corrigan, C.J., *ante* at 14-16; opinion of Kelly, J., *ante* at 9-10. As already indicated,
(continued…)

Moreover, gambling on the subject Indian lands absent the challenged compacts was unlawful pursuant to 25 USC 2710(d)(1)(C). This is because, as noted, § 2710(d) provides that "[c]lass III gaming activities *shall be lawful* on Indian lands *only if* such activities are . . . conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ." Therefore, before these challenged compacts existed, gambling on the subject Indian lands was *unlawful*.

(…continued)

I agree with the United States Court of Appeals for the Ninth Circuit in *Artichoke Joe's, supra* at 722, that, "the fact that the federal government retained [the enforcement] power does not change the fact that [states] may enact laws and regulations concerning gambling that have an effect [in the absence of a compact] on Indian lands." That is, the states retain *substantive* authority over gambling law on Indian lands. See n 6. Chief Justice Corrigan further states that § 1166 does not truly give the states regulatory power because "the federal government may conclude at any time that it will no longer apply state law and so amend IGRA." *Ante* at 16. While it is true that it is within Congress's power to amend IGRA, this fact is irrelevant because we are called upon to decide this case under the law as it is today, and not under the law as it could conceivably one day be. Moreover, Chief Justice Corrigan opines that Congress chose to make state casino gambling laws applicable to Indian land "for expediency." *Id.* She provides no support for this finding. The relevant legislative history indicates that Congress chose to make state gambling laws applicable to tribes not for reasons of "expediency," but to specifically give states some regulatory power over casino gambling on Indian land. See *Cheyenne River Sioux Tribe, supra* at 526.

27

Thus, it becomes clear that, before the challenged compacts existed, the tribes would have been engaging in an unlawful activity had they endeavored to operate their respective casinos. It necessarily follows that the compacts had the intended purpose, and the effect, of altering legal rights and relations of Michigan citizens generally. The compacts purport to allow Indian tribes to lawfully engage in activities that would otherwise be unlawful.

Moreover, the compacts impose specific duties upon both the members of the tribes and upon non-Indian peoples and entities. By way of example, the compacts impose a duty on the tribes to administer and enforce on the casinos the regulatory requirements embodied in the compacts. Further, the compacts impose a duty on local units of government to create a local revenue sharing board to receive and distribute a percentage of casino profits that the tribes are required under the compacts to disburse. Alternately, if the local units of government do not create a local revenue sharing board, it may be said that the compacts impose a duty on local units of government to expend their own government funds to cover the inevitable costs for public services, police, etc., that they will incur as a result of having a casino in their area. Under

**28**

either scenario, the compacts impose duties on local units of government.[18]  Accordingly, it is clear that the compacts

------

[18] Defendants argue, and the majority concludes, that the compacts do not actually *require* the creation of local revenue sharing boards, but rather *permit* local units of government to voluntarily create such boards if they wish to enjoy the benefits of the annual percentage payment that the tribes are to make to those local units of government pursuant to the compacts.  Opinion of Corrigan, C.J., *ante* at 18-19; opinion of Kelly, J., *ante* at 13-14.  This argument is both flawed and disingenuous.  First, as is expressly stated in the compacts themselves, the annual payment of funds by the tribe to the local revenue sharing boards is meant to "provide financial resources to those political subdivisions of the State *which actually experience increased operating costs associated with the operation of the Class III gaming facility[ies]*."  See § 18(A)(ii) of the compacts.  Thus, it is evident that the "choice" the local units of government have is either: (1) to create a local revenue sharing board or (2) to simply assume the *actual costs* incurred by the unit of government in the operation of the casinos.  Either choice, as noted above, imposes a duty on local units of government.  Moreover, I note that the compacts purport to *mandate* the creation of the local revenue sharing boards, as evidenced by the term "shall."  That is, the compacts provide that "a Local Revenue Sharing Board *shall* be created by those local units of government . . . ."  Thus, the compacts themselves do not purport to provide any "choice" on this matter.

My colleagues espouse a third-party beneficiary analysis in reaching their conclusion that the compacts impose no duties on local units of government.  Opinion of Corrigan, C.J., *ante* at 18-19; opinion of Kelly, J., *ante* at 14.  It may be that under contract law, the local units are indeed third-party beneficiaries.  However, that is simply not dispositive, nor particularly relevant, in this case.  The fact remains that local units of government must either create the revenue sharing boards or assume the actual costs incurred by the units of government in the operation of the casinos.

**29**

had the intended purpose and the effect of altering the legal duties generally of Michigan citizens.

Further, the tribal-state compacts alter legal relationships because the compacts remove from the federal government the jurisdiction to enforce the applicable state gambling laws and regulations that apply, pursuant to § 1166, on Indian land in the absence of a tribal-state compact and place that jurisdiction in the hands of the tribes themselves. This change in jurisdiction affects Michigan citizens generally because citizens engaging in gambling in tribal casinos were formerly subject to federal jurisdiction, but are now subject to tribal jurisdiction. Additionally, the compacts alter the legal relationships of Michigan citizens generally because they may allow anyone over the age of eighteen to gamble in tribal casinos, whereas the legal gambling age that applies to Michigan casinos subject to the MCGRA is twenty-one.

Thus, the first factor of the *Chadha/Blank* framework leads to the conclusion that the compacts constitute legislation. That is, the compacts "had the [intended] purpose and effect of altering . . . legal rights, duties and relations of persons . . . outside the legislative branch." *Blank*, *supra* at 114.

## ii. Supplanting legislative action

The second *Chadha/Blank* factor requires that we consider whether the Governor's action in negotiating the compacts and the Legislature's resolution vote on the compacts "supplanted legislative action."  In *Blank, supra* at 114, we further elaborated on this point, as did the United States Supreme Court in *Chadha,* by considering whether "[t]he only way the House could have [properly] obtained the same result would have been by enacting legislation."  Thus, we must consider how, in the absence of the challenged compacts, the Legislature could alternatively have achieved the same result, i.e., how the Legislature could alternatively have made gambling on Indian land lawful.  If no IGRA tribal-state compact exists, general state laws pertaining to the regulation or prohibition of gambling apply on any particular Indian land as they apply elsewhere in the state.  18 USC 1166. Therefore, in the absence of a compact, if the Legislature wanted to make gambling on Indian land lawful, the only way it could do that would be by either changing the gambling laws that are generally applicable within the state or by changing the reach of the MGCRA.  Changing those laws would, it cannot seriously be disputed, require "legislation."  Thus, it becomes clear that the compacts

**31**

effectively supplanted legislative action and, therefore, they themselves constitute "legislation."[19]

### iii. DETERMINATIONS OF POLICY

The third *Chadha/Blank* factor requires that we consider whether the compacts "involved determinations of policy." *Blank, supra* at 114. The compact negotiation process required the Governor to undertake and resolve multiple policy-making decisions of great consequence to this state, the most significant of which was the initial decision to make lawful what was otherwise unlawful—casino gambling on the subject Indian lands. The fact that casino gambling engenders considerable controversy and passion throughout our society at large, as evidenced by the very existence of this lawsuit, underscores the significance of the policy decision that these compacts represent.

Moreover, the compacts represent a host of additional policy decisions that sprang from the initial decision to make gambling lawful on the subject Indian lands. These

---

[19] Furthermore, the compacts "supplant legislative action," *Blank, supra* at 114, because they attempt to bind the state to their terms for a period of twenty years, and during those twenty years, the Legislature may not, even by appropriate legislative action, amend or repeal the compacts. Thus, the compacts not only supplant current legislative actions, but in effect, they likewise supplant any future proper legislative action that the Legislature might otherwise undertake regarding this issue.

include, but certainly are not limited to, decisions regarding the number of compacts to sign and the number of casinos to allow, the minimum gambling age that would be enforced in the relevant casinos, the percentage of profits that the tribes would be required to submit to the state and the subsequent use of those funds by the state, the decision to incorporate into the compacts the protections of the Michigan Employment Security Act, MCL 421.1 *et seq.,* and the Worker's Disability Compensation Act, MCL 418.101 *et seq.,* and the decision to leave enforcement of the compact rules and regulations to the tribes themselves rather than delegating that duty to the relevant state agencies as the state clearly could have done pursuant to 25 USC 2710(d)(3)(C).[20]

---

[20] It appears that that Court of Appeals considered significant the fact that the compacts do not give the state the power to enforce them other than by arbitration or mediation. The Court of Appeals stated, "While states may have the ability [under IGRA] to negotiate and include regulatory terms in the compacts, there is no mechanism for enforcement. Rather, any dispute is submitted to arbitration or a mediator. Consequently, the challenge to the method of approval by resolution is without merit." Slip op at 13. Likewise, defendants emphasize, as did the Court of Appeals, *id.,* that the compacts confer no regulatory power on the state because the responsibility to ensure that the compacts' "regulatory requirements" are being enforced within the casinos lies solely within the tribes' hands; and therefore the compacts are not "legislation." However, IGRA provides that compacts may include provisions relating to "the allocation of criminal

(continued…)

In my judgment, these policy decisions are exactly the sorts of decisions that properly belong within the province of the Legislature.[21]   This point was well made by the

(…continued)

and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations . . . ." 25 USC 2710(d)(3)(C)(2). Thus, the compacts *could* have granted the state the jurisdiction to enforce the relevant laws and regulations. Justice Kelly concedes that if the compacts "extend[ed] state jurisdictional authority to tribal land," they would constitute legislation. *Ante* at 16. In my judgment, the decision to place the enforcement jurisdiction entirely within the tribes' hands, as well as the decision to resolve compact disputes through mediation and arbitration, were, in fact, policy decisions made by the Governor that may not now be used to insulate the compacts from a finding that they constitute legislation. Chief Justice Corrigan likewise refers to many of the compact terms in order to support her contention that the compacts do not constitute legislation. *Ante* at 17-21. As an example, she notes that "[u]nder the terms of the compacts, the tribes themselves, not the State, regulate the conduct of Class III gaming on tribal lands. The Legislature has no obligations regarding the regulation of gaming whatsoever, nor can the State unilaterally enforce a violation of the compacts." *Ante* at 17-18. This term, and the other compact terms discussed in the Chief Justice's opinion, were the direct result of policy choices made on behalf of the state by the Governor and should not now be used circularly to insulate the compacts from being characterized as legislation. It is, in part, precisely because the compacts resolve such fundamental policy choices that they constitute legislation.

[21] As noted in n 16, MCL 432.203 indicates that the Legislature itself recognized this when it provided in the MGCRA that the *Legislature* must, if permitted by federal law, enact an act similar to and consistent with the MGCRA that would govern casino gambling in Indian territory, just as the MGCRA governs other casino gambling that is authorized in Michigan.

highest court for the state of New York, the Court of Appeals of New York, in a decision in which that Court held that IGRA tribal-state compacts represent legislation. In *Saratoga Co Chamber of Commerce v Pataki,* 100 NY2d 801, 822-823; 798 NE2d 1047; 766 NYS2d 654 (2003), the Court stated:

> IGRA itself contemplates that states will confront several policy choices when negotiating gaming compacts. Congress provided that potential conflicts may be resolved in the compact itself, explicitly noting the many policies affected by tribal gaming compacts. Indeed, gaming compacts are laden with policy choices, as Congress well recognized.

> "Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to—

> "(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

> "(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

> "(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

> "(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

35

"(v) remedies for breach of contract;

"(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

"(vii) any other subjects that are directly related to the operation of gaming activities."
[25 USC 2710(d)(3)(C).]

*Compacts addressing these issues necessarily make fundamental policy choices that epitomize "legislative power." Decisions involving licensing, taxation and criminal and civil jurisdiction require a balancing of differing interests, a task the multi-member, representative Legislature is entrusted to perform under our constitutional structure.* [Emphasis added.]

I agree with the court's decision on this issue in *Saratoga Co* and with the other state supreme courts that have considered this issue and reached a similar conclusion. See *State ex rel Clark v Johnson,* 120 NM 562; 904 P2d 11 (1995); *State ex rel Stephan v Finney,* 251 Kan 559; 836 P2d 1169 (1992); *Panzer v Doyle,* __ Wis 2d __; 680 NW2d 666 (2004); *Narragansett Indian Tribe of Rhode Island v Rhode Island,* 667 A2d 280 (RI, 1995).[22]  It is evident

---

[22] My research revealed that every state supreme court that has directly considered this issue has held that tribal-state gaming contracts constitute legislation. The majority cites to *Confederated Tribes of the Chehalis*
(continued…)

that the compacts "involved determinations of policy,"
*Blank, supra* at 114, such that they themselves constitute
"legislation."

### iv.  Michigan Constitution

The fourth Chadha/Blank factor requires that we consider whether Michigan's Constitution explicitly authorizes the Legislature to approve these compacts by resolution even if the compacts otherwise constitute legislation.

Before 1908, the Michigan Constitution allowed the Legislature to make laws by the resolution process.  See Const 1850, art 4, § 19.  However, the constitutions of 1908 and 1963 leave out that earlier proviso, and our Constitution now makes it entirely clear, as already

---

(…continued)
*Reservation v Johnson*, 135 Wash 2d 734, 750; 958 P2d 260 (1998), for an opposite conclusion. Opinion of Corrigan, C.J., *ante* at 17; opinion of Kelly, J., *ante* at 15.  In that case, the Supreme Court of Washington stated that tribal-state compacts are "agreements" and not legislation. However, the issue in that case was whether the compacts were subject to Washington's public records disclosure act, and the court's statement regarding the legislative nature of a compact, which was made with no analysis whatever, was therefore not in response to a direct consideration of that question.  Justice Kelly likewise string cites *Confederated Tribes of Siletz Indians of Oregon v Oregon*, 143 F3d 481 (CA 9, 1998), and *Gallegos v Pueblo of Tesque*, 132 NM 207, 218; 46 P3d 668 (2002).  Both those cases are equally irrelevant to the instant issue.

37

explained, that lawmaking is subject to the enactment requirement. See Const 1963, art 4, §§ 1, 22, and 26.

In *Becker v Detroit Savings Bank,* 269 Mich 432, 434-436; 257 NW 855 (1934), this Court considered whether a legislative resolution can create binding law. In accordance with our Constitution, the *Becker* Court held that it could not, stating:

> The language of the constitution is in itself a complete answer to the proposition. It provides in express terms that there shall be but one mode of enacting a "law" thereunder, and that mode is the exclusive measure of the power of the legislature in that regard. *A mere resolution, therefore, is not a competent method of expressing the legislative will, where that expression is to have the force of law, and bind others than the members of the house or houses adopting it. . . .* The requirements of the Constitution are not met by that method of legislation. "Nothing becomes law simply and solely because men who possess the legislative power will that it shall be, unless they express their determination to that effect in the mode pointed out by the instrument which invests them with the power, and under all the forms which that instrument has rendered essential." Cooley, [Const Lim at 155, ch 6.] . . .
>
> * * *
>
> [W]hile the resolution of the Legislature is entitled to respectful consideration, it is not law and courts are bound by the law. [*Id.* at 434-436 (emphasis added).]

Moreover, Michigan's Constitution provides a number of specific instances in which the Legislature is explicitly authorized to act by way of resolution. See Const 1963,

**38**

art 4, §§ 12, 13, 37; art 5, § 2; art 6, § 25. However, none of these provisions is applicable to this issue and none provides a basis for concluding that our Constitution explicitly grants the Legislature the authority to approve the instant compacts by way of resolution even though they otherwise constitute legislation.[23] Therefore, the Legislature's approval of the challenged compacts is not constitutionally exempted from the general lawmaking procedures embodied in our Constitution. Thus, the fourth *Chadha/Blank* factor likewise leads to a finding that the Legislature was required to adopt the compacts consistently with the enactment requirements of Michigan's Constitution.

Accordingly, in my judgment, the tribal-state compacts at issue constitute legislation. The compacts had the purpose and effect of generally altering legal rights,

---

[23] The majority concludes that legislative approval by resolution was appropriate because the Constitution is a limit on our Legislature's power rather than a grant of power and, therefore, the Legislature may do anything that it is not specifically prohibited by the Constitution from doing. Opinion of Corrigan, C.J., *ante* at 21-22; opinion of Kelly, J., *ante* at 17. It may well be true that the Constitution is a limit on legislative power, but one of those limits is embodied in Const 1963, art 4, § 22 and § 26, and these require that legislation be by bill. The majority essentially engages in a faulty, circular argument to support the conclusion that the compacts are not legislation.

duties, and relations of Michigan citizens; they supplanted legislative action; they represent determinations of policy issues of fundamental importance to the social and economic environment of the state of Michigan; and our Constitution does not authorize the Legislature to approve the compacts by a resolution vote.

## B. IS A RESOLUTION NONETHELESS CONSTITUTIONAL?

Having determined that the *Chadha/Blank* analytical framework leads to the conclusion that the compacts constitute "legislation" subject to the enactment requirement of Michigan's Constitution, I will now consider the significant issues raised by defendants and upon which the majority opinions are primarily based.

### i. FEDERAL PREEMPTION

First, Justice Kelly concludes that the compacts are not "legislation" because federal law preempts Indian gambling regulation unless the state prohibits gambling. Thus, because Michigan permits limited casino gambling, Justice Kelly reasons that Michigan may not legislate with respect to gambling on Indian land. *Ante* at 5-8. In support of this proposition, the opinion refers to 25 USC 2701 of IGRA, which provides:

The Congress finds that

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

Justice Kelly has misconstrued the relevance of § 2701(5). This provision is simply a part of the Congress's legislative "findings" and does not constitute substantive law.[24] That is, the Congress found, before enacting IGRA, that Indian tribes had the "exclusive right to regulate gaming activity on Indian lands if the gaming activity [was] not specifically prohibited by Federal law and [was] conducted within a State which did not . . . prohibit such gaming activity."[25] *Id.* Having so found, the Congress

---

[24] A "findings" statement in a federal act is a part of what is commonly referred to as the "preamble." As long ago as 1889, the United States Supreme Court, in *Yazoo & M V R Co v Thomas,* 132 US 174; 10 S Ct 68; 33 L Ed 302 (1889), stated: "[A]s the preamble is no part of the act, and cannot enlarge or confer powers, nor control the words of the act, unless they are doubtful or ambiguous, the necessity or resorting to it to assist in ascertaining the true intent and meaning of the legislature is in itself fatal to the claim set up." See also Singer, 1A Sutherland Statutory Construction (6th ed), § 20:3, p 123: "The function of the preamble is to supply reasons and explanations and not to confer power or determine rights. Hence it cannot be given the effect of enlarging the scope or effect of a statute."

[25] This congressional finding comports with the pre-IGRA opinion of the United States Supreme Court in *Cabazon*
(continued…)

**41**

subsequently enacted IGRA in order to "provide a statutory basis for the regulation of gaming . . . ." 25 USC 2702(2). Because 25 USC 2701(5) is not substantive law, Justice Kelly errs in invoking it as such and using it to effectively shield Indian tribes from state regulation of gambling otherwise consistent with the text of IGRA.

### ii. STATE AUTHORITY TO LEGISLATE

Second, defendants argue that the compacts cannot constitute legislation because the state has no authority to legislate casino gambling on Indian lands, and, therefore, the compacts merely constitute an "agreement" between the tribe and the state that has nothing to do with "legislation." However, pursuant to the express terms of IGRA itself, the Congress recognized that a tribal-state compact may result in state legislation. Therefore, it cannot be disputed that IGRA permits states to legislate pursuant to a compact. Section 2710(d)(5) of IGRA

---

(…continued)
in which the Court acknowledged that if California *prohibited* casino gambling within its borders, California could enforce its criminal laws relating to that prohibition on Indian lands through 18 USC 1162; but absent express Congressional permission, California could not enforce its purely *regulatory* gambling laws on Indian lands. Thus, under *Cabazon,* Indian tribes indeed had the exclusive right to regulate casino gambling on Indian lands if the gambling was not specifically prohibited by federal law and was conducted within a state that did not prohibit such gambling.

**42**

provides:

> Nothing in this subsection shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with the State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by any tribal-state compact entered into by the Indian tribe under paragraph (3) that is in effect.

This section both affirms that an Indian tribe's right to regulate gambling on its lands is not exclusive and that the state does, indeed, have authority to regulate gambling on Indian lands through lawmaking. The compact provisions in IGRA merely ensure that any state regulation over tribal gambling arises out of the negotiation process; they do not, however, prohibit such regulation.

The majority concludes, however, that the fact that the compacts must arise out of the negotiation process means that they do not constitute "legislation" because legislation must be "unilateral." Opinion of Corrigan, C.J., *ante* at 9-10; opinion of Kelly, J., *ante* at 11-12. That is, if a tribal-state compact, and thus any state regulation over tribal gambling, can only result through a federally mandated negotiation process, it cannot be said that the state enjoys a right to "unilaterally" legislate gambling on Indian land. In support of this theory—that unless a state may "unilaterally" regulate, it may not

**43**

"legislate"—Justice Kelly refers to this Court's opinion in *Westervelt v Natural Resources Comm,* 402 Mich 412, 440; 263 NW2d 564 (1978). *Ante* at 11-12.

*Westervelt* considered whether an executive agency "legislates" when it engages in rulemaking pursuant to a legislative delegation of power. If so, the executive agency would be violating the separation of powers doctrine embodied in Const 1963, art 3, § 2 because, pursuant to Const 1963, art 4, § 1, "[t]he legislative power of the State of Michigan is vested in [the Legislature]."[26] *Westervelt*, in concluding that an executive agency does not legislate when it engages in rulemaking, stated, "the concept of 'legislation,' in its essential sense, is the power to speak on any subject without any specified limitations." *Westervelt, supra* at 440. (Emphasis deleted). The "specified limitations" referred to in *Westervelt* were those limitations inherent in the legislative delegation of authority to the executive branch. Because an executive agency is confined in its exercise of authority to the relevant legislative

---

[26] Compare the United States Constitution, art I, § 1, in which "*All* legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." (Emphasis added.)

delegation, including any specific limitations upon such delegation set by the Legislature, the power to engage in rulemaking is not a power to "legislate."  It could not be such a power under the Constitution if the delegation is valid because the Constitution does not allow any entity to exercise "legislative power" other than the Legislature.[27]

Justice Kelly argues that the power to speak "without any specified limitations" means the power to "unilaterally" legislate.  In this case, she argues, the Legislature may not speak "without specified limitations" because it is limited by the mandate that the state must negotiate in good faith with the tribes and, therefore, it may not legislate.  *Ante* at 11-12.  In my judgment, *Westervelt* must be interpreted within the different context of that case.  I see no reason to expand its specific holding to mean that any time the Legislature is constricted in any sense by "any specified limitation," it may not "legislate."  A legislature is always subject to

---

[27] *Westervelt*, considered in its totality, actually supports plaintiffs' position in this case.  This is because the compacts constitute legislation, yet the legislative power is exclusively vested in the Legislature. Const 1963, art 4, § 1.  Thus, when the Governor negotiated and signed the compacts without having first received a proper delegation of power from the Legislature, he effectively exercised the Legislature's functions in contravention of Const 1963, art 3, § 2.

"specified limitations," such as those posed by the federal and state constitutions, or, in this case, by federal law. Indeed, the very premise of our constitutional system is that all governmental institutions operate under "specified limitations." The fact that federal law imposes some limits on the state's power to regulate in a specific area simply cannot mean that any legislative action touching upon such an area is not actually "legislation."

Chief Justice Corrigan, in support of her contention that the state has no power to "unilaterally" regulate, and therefore legislate, tribal gambling under § 2710(d), cites *Boerth v Detroit City Gas Co*, 152 Mich 654; 116 NW 628 (1908), and *Detroit v Michigan Pub Utilities Comm* (*MPUC*), 288 Mich 267; 286 NW 368 (1939), for the proposition that the power to legislate does not require "consent" from those subject to its powers. *Ante* at 9-10. Because § 2710(d) provides for a process of negotiation, the Chief Justice opines that it gives tribes a power to "consent" that negates a finding that a compact constitutes legislation. In *Boerth* and *MPUC*, this Court held that, absent a legislative delegation of power to Detroit, Detroit possessed no legislative power to set gas rates because such power was within the exclusive jurisdiction of the Legislature. However, Detroit was found to possess a

power to contract for reasonable gas rates under its power to control its streets.  In this case, the state possesses regulatory power over tribal casino gambling even in the absence of a compact, see § 1166, including the outright power to prohibit such gambling.  Moreover, the "consent" that the Chief Justice argues that the tribes may exercise in this case, by virtue of § 2710(d), is the type of "consent" referred to in *Boerth* and *MPUC*.  Although § 2710(d) provides for a negotiation process, the tribes are *not* wholly free to withhold their "consent" from the Legislature to enter into contracts regulating casino gambling on their lands and to, instead, engage in such gambling without compacts.  This is because in the absence of a compact, casino gambling is *unlawful.*  § 2710(d)(1).[28]

---

[28] I do not accept the premise of the Chief Justice that, when a state exercises its regulatory authority over casino gambling within its borders, expressly granted to it by Congress, and makes that which was unlawful into that which is lawful, and in doing so binds itself to specific terms and conditions under which that which was unlawful is now lawful, the state is not "legislating" merely because IGRA provides a mechanism by which the tribes may participate in the negotiation process.  The pertinent consideration in determining whether a compact constitutes legislation is not whether IGRA purports to compel a state to negotiate in good faith with a tribe, but rather whether the compact bears the larger hallmarks of "legislation." These hallmarks are sufficiently expounded upon in *Chadha/Blank*, and, as already discussed, I believe they
(continued…)

47

### iii. CONTRACTUAL NATURE OF COMPACTS

Third, the majority concludes that the tribal-state compacts are not legislation because they merely constitute contracts between two sovereign entities that the Governor, pursuant to IGRA, may enter into on behalf of the state and that the Legislature may approve of by resolution vote.[29] Opinion of Corrigan, C.J., *ante* at 9-10; opinion of Kelly, J., *ante* at 15. I do not dispute that the compacts are akin to contracts of a unique nature. However, as explained above, these "contracts" create new law and constitute legislation and they purport to bind the state of Michigan to that legislation. That is the pivotal consideration in this case. A "contract" may, in effect,

---

(…continued)
lead to the conclusion that these sorts of compacts constitute legislation.

[29] If the majority were correct, but for the term in the compacts themselves stipulating that they become effective only upon resolution approval by the Legislature, the Legislature would not be required to approve them. This is because the Legislature's power is the power to legislate. Const 1963, art 4, § 1. Therefore, unless the compacts constitute legislation, neither the Constitution nor any other source of law would require that they be approved by the Legislature by any method. Thus, under the majority's faulty analysis, there is no reason that the Governor, in the future, cannot simply bind the state to casino compacts without even seeking resolution approval from the Legislature.

Thus, the compacts would have been effective between the state and the tribe once they had been signed by the Governor.

create new law and such a legislative contract should not be exempt from the constitutional provisions otherwise applicable to legislation.[30] Neither the executive nor the legislative branch of our state government may circumvent the constitutionally mandated processes for enacting legislation by entering into a contractual relationship. However, I will consider whether there is some source of law that *does* allow the Governor to enter into a compact without legislative approval consistently with the enactment requirement of Michigan's Constitution.

First, it should be considered whether IGRA itself, regardless of state constitutional procedures, provides that a Governor may enter into a tribal-state compact with only a resolution vote of the Legislature. It is clear that IGRA does not so provide. The court in *Saratoga Co, supra* at 822, stated:

---

[30] See *Flint & F Plank-Road Co v Woodhull,* 25 Mich 99, (1872), in which Justice Cooley acknowledged that a charter-compact is both a "law" *and* a contract. "It is not disputed . . . that the charter of a private corporation is to be regarded as a contract, whose provisions are binding upon the State . . . . *Such a charter is a law,* [and] it . . . also . . . contains stipulations which are terms of compact between the State as the one party, and the corporators as the other . . . ." *Id.* at 101. (Emphasis added.) Thus, a "contract" may clearly be a vehicle for creating both legislation and contractual terms that are binding on the state.

**49**

IGRA imposes on "the State" an obligation to negotiate in good faith (25 USC 2710[d][3][a]), but identifies no particular state actor who shall negotiate the compacts; *that question is left up to state law . . . .* As the Supreme Court noted, the duty to negotiate imposed by IGRA "is not of the sort likely to be performed by an individual state executive officer or even a group of officers." [Quoting *Seminole Tribe of Florida v Florida,* 517 US 44, 75 n 17; 116 S Ct 1114; 134 L Ed 2d 252 (1996), citing *State ex rel Stephen Finney, supra.*]

Likewise, in *Clark, supra* at 577, the Supreme Court of New Mexico stated:

We entertain no doubts that Congress could, if it so desired, enact legislation legalizing all forms of gambling on all Indian lands in whatever state they may occur. . . . That is, however, not the course that Congress chose. Rather, Congress sought to give the states a role in the process . . . . It did so by permitting Class III gaming only on those Indian lands where a negotiated compact is in effect between the state and the tribe. [25 USC 2710(d)(1)(C).] To this end, the language of the IGRA provides that "Any *State* . . . may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian Tribe." *Id.* § 2710(d)(3)(B). The only reasonable interpretation of this language is that it authorizes state officials, *acting pursuant to their authority held under state law,* to enter into gaming compacts on behalf of the state. [Emphasis added.]

Accordingly, IGRA does not provide or require that the Governor shall have the power to bind the state to tribal-state compacts with only a resolution vote of the Legislature. The pertinent consideration is which state actor has the power to bind the state to a legislative

**50**

compact and according to which procedures *under state law*.[31]

Second, it is therefore necessary to consider whether state law grants the Governor the authority to bind the state to a tribal-state compact with only a resolution vote of the Legislature regardless whether that compact

---

[31] Because IGRA does not purport to require or allow the Governor to negotiate a tribal-state compact subject only to a resolution vote, we need not consider whether such a provision in the IGRA would be lawful. However, I note the following statement made by the court in *Clark, supra* at 577:

> [The governor] . . . argues that he possesses the authority, as a matter of *federal law*, to bind the State to the terms of the compact . . . . We find the Governor's argument on these points to be inconsistent with core principles of federalism. The Governor has only such authority as is given to him by our state Constitution and statutes enacted pursuant to it. . . . We do not agree that Congress, in enacting the IGRA, sought to invest state governors with powers in excess of those that the governors possess under state law. Moreover, we are confident that the United States Supreme Court would reject any such attempt by Congress to enlarge state gubernatorial power. Cf. *Gregory* [*v Ashcroft*, 501 US 452, 460; 111 S Ct 2395; 119 L ED 2d 410 (1991)] (recognizing that "[t]hrough the structure of its government . . . a State defines itself as a sovereign"); *New York v. United States*, [505 US 144, 176; 112 S Ct 2408; 120 L. Ed. 2d 120 (1992)] (striking down an act of Congress on the ground that principles of federalism will not permit Congress to "'commandeer[] the legislative processes of the States'" by directly compelling the states to act) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* [452 US 264, 288; 101 S Ct 2352; 69 L Ed 2d 1 (1981)] . . . .

**51**

constitutes legislation. The Michigan Constitution provides that "[t]he executive power is vested in the governor." Const 1963, art 5, § 1. The majority essentially argues that the executive power includes the power to bind the states to contractual agreements with sovereign entities and, therefore, whether those agreements otherwise constitute "legislation" is irrelevant. The "executive power" is, first and foremost, the power to enforce. This observation was concisely summed up by this Court in *People ex rel Attorney General v Holschuh,* 235 Mich 272, 274-275; 209 NW 158 (1926), in which we stated, "Consideration of some fundamental principles relative to the powers of government will aid greatly in determining the issues before us. . . . The law . . . must observe constitutional limitations; but within such limitations the legislative power may command, *the executive power must enforce*, and the judicial power respond." (Emphasis added.)[32] While our state Constitution grants specific

---

[32] See Const 1963, art 5, § 8: "The governor shall take care that the laws be faithfully executed." See also *The People ex rel Sutherland v Governor,* 29 Mich 320, 324-325 (1874), in which Justice Cooley stated: "And that there is such a broad general principle seems to us very plain. Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike
(continued…)

additional powers to our executive branch of government beyond the "enforcement" of legislative enactments, I find no provision in our Constitution that supports a finding that the Governor possesses broad powers to bind the state to legislative compacts with foreign sovereignties absent legislative action consistent with the enactment requirement.  Nor have my colleagues pointed to any language of that sort.

In addressing this issue, it is also necessary to consider what our Constitution does say regarding the Governor's right to bind the state to an "intergovernmental agreement."  Const 1963, art 3, § 5 provides:

> Subject to provisions of general law, this state or any political subdivision thereof, any governmental authority or any combination thereof may enter into agreements for the performance, financing or execution of their respective functions, with any one or more of the other states, the United States, the Dominion of Canada, or any political subdivision thereof unless otherwise provided in this constitution. . . .

(…continued)
limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. One makes the laws, another applies the laws in contested cases, *while the third must see that the laws are executed*. This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others."  (Emphasis added.)

53

Thus, pursuant to this constitutional provision, the Governor of this state may enter into intergovernmental agreements without the advice or consent of the Legislature—whether by resolution vote or consistently with the enactment requirements of our Constitution. However, this power is not unlimited. First, it is specifically limited to agreements with "the other states, the United States, the Dominion of Canada, or any political subdivision thereof." The power to enter into an intergovernmental agreement with an Indian tribe is conspicuously absent. Second, the power is specifically limited to those agreements necessary "for the performance, financing or execution of [its] functions." Neither IGRA nor any other law places the duty or the power to determine the scope and parameters of gambling within Michigan's borders, on or off Indian lands, within the "functions" of the executive branch. Accordingly, unless the Legislature properly delegates to the executive branch a rulemaking power to set the parameters for gambling on Indian lands within Michigan's borders, that power is not, in my judgment, reasonably within the scope of the executive branch's "functions."

It may be said that because the intergovernmental agreement provision of the Michigan Constitution does not

**54**

refer to agreements with Indian tribes that provision is inapplicable to this case. However, in light of the fact that the powers of the executive branch are constitutionally defined, I read additionally a negative implication in Const 1963, art 3, § 5. Because our Constitution contains an express provision regarding intergovernmental agreements that may validly be entered into by governmental authorities, I conclude that, subject to provisions of general law, intergovernmental agreements beyond the scope of Const 1963, art 3, § 5 are invalid.[33]

Moreover, even were I to decline to read a negative implication into Const 1963, art 3, § 5, this provision is, nonetheless, significant insofar as it expressly provides that, in the realm of applicable intergovernmental agreements, no branch of the government may contract in

---

[33] Const 1963, art 3, § 5 provides that it is "subject to general law." Therefore, a governmental authority may enter into an intergovernmental agreement with an Indian tribe despite the fact that tribes are not specifically mentioned in art 3, § 5 provided the agreement is consistent with provisions of general law. Federal law, under IGRA, permits a state to enter into a tribal-state gambling compact. However, because the compacts at issue constitute legislation, state law, particularly Const 1963, art 4, §§ 22 and 26, requires that they be approved by the Legislature by bill. Therefore, consistently with these provisions of general law, the Legislature may bind the state to tribal-state gambling compacts despite the fact that "Indian tribes" are not specifically referenced in art 3, § 5.

such a way that is *inconsistent* with its own powers or that usurps the powers of another branch. That rule, which is consistent with the separation of powers doctrine of Const 1963, art 3, § 2, should apply equally to intergovernmental agreements that are expressly subject to Const 1963, art 3, § 5, as well as those that are not. Thus, in any case, a governmental authority may only bind the state to an intergovernmental agreement that is "for the performance, financing or execution *of their respective functions . . . ."* *Id.* As already noted, absent a proper legislative delegation of power to the executive branch, the duty and power to set the parameters for casino gambling on land within Michigan's borders is not in any comprehensible sense a "function" of the executive branch.

The United States Constitution expressly provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . ." US Const, art II, § 2, cl 2.[34] The Michigan Constitution notably

---

[34] It is noteworthy that federal case law acknowledges that treaties are both agreements with other sovereignties, *and* they create "law." See *El Al Israel Airlines, Ltd v Tsui Yuan Tseng,* 525 US 155, 167; 119 S Ct 662; 142 L Ed 2d 576 (1999), in which the United States Supreme Court stated: "'Because *a treaty* ratified by the United States is not only the law of this land, see U.S. Const., Art. II, §
(continued…)

contains no explicit authorization for the Governor to enter into treaties with sovereign nations without the majority approval of the entire Legislature. I have found no case law, nor have my colleagues identified such a law, that would support a determination that, despite our Constitution's silence on the issue, such a right exists.[35]

(…continued)
2, but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (*travaux préparatoires*) [italics in original] and the post-ratification understanding of the contracting parties.'" (Citation omitted; emphasis added.) The point is that, pursuant to US Const, art II, § 2, treaties are binding *even though they amount to lawmaking* because the federal Constitution expressly so provides. Thus, that the tribal-state compacts at issue here are akin to contracts with a sovereign power does not, by that fact alone, mean that the compacts do not constitute "lawmaking." I believe the majority's conclusion that the compacts are not legislation simply because they are "contracts" with sovereign nations to be without merit. See also n 30.

[35] Does the Governor possesses some "inherent" authority to bind the state to a legislative compact with only a resolution vote of the Legislature, or indeed unilaterally? While the Governor has the power to issue executive orders on his own accord that have the status of enacted law, the permissible scope of such orders is limited by the express powers constitutionally or legislatively delegated to the Governor. See, generally, *House Speaker v Governor*, *supra* at 578-579; see also *Straus v Governor,* 230 Mich App 222, 228-230; 583 NW2d 520 (1998). Further, the separation of powers doctrine embodied in Michigan's Constitution provides that "[n]o person exercising powers of one branch shall exercise powers properly belonging to another branch *except as expressly provided in this constitution.*" Const 1963, art 3, § 2. Tribal-state compacts constitute legislation, and all
(continued…)

I believe that no source of law, federal or state, exists that would permit the Governor to bind the state to these legislative compacts without the approval of the Legislature consistent with the enactment requirements of Michigan's Constitution. Because the compacts constitute legislation, they were subject to Const 1963, art 4, §§ 22 and 26. Therefore, I would reverse the judgment of the Court of Appeals on this issue and hold that the approval of HCR 115 by resolution, rather than by bill, did not comport with the enactment requirement of our Constitution.[36]

### C. DO AMENDATORY PROVISIONS VIOLATE THE CONSTITUTION?

Each of the challenged tribal-state compacts contains

---

(…continued)
legislative power is constitutionally vested in the Legislature. Const 1963, art 4, § 1. Therefore, the Governor may not bind the state to such a compact under some "inherent" power because the Governor may exercise legislative powers only "as expressly provided in this constitution." Const 1963, art 3, § 2. Nowhere does our Constitution expressly, or otherwise, grant the Governor a power to bind the state to a legislative agreement with another sovereignty.

[36] The pertinent question in this case is whether the compacts constitute legislation. Because they do, the Legislature should have approved HCR 15 by bill. If the compacts did not constitute legislation, then no legislative approval, by either bill or resolution, would have been *constitutionally* required. In that case, the Legislature would have been required to approve the compacts only because the compacts themselves expressly required it in § 11, and either resolution or bill approval of HCR 115 would have been sufficient.

a provision that purports to empower the Governor to amend it on behalf of the state without seeking legislative approval of any specific amendment.[37] This provision, plaintiffs contend, violates the separation of powers doctrine embodied in art 3, § 2 of Michigan's Constitution because it grants broad authority to the Governor to usurp a legislative power. That is, plaintiffs argue that, like the original compacts, any amendment constitutes "legislation" that is subject anew to the enactment requirement of Const 1963, art 4, § 26. Plaintiffs essentially argue that even had the Legislature properly adopted the compacts, the specific amendatory provision would nonetheless violate the separation of powers doctrine because the Legislature may not, even by properly enacted legislation, grant the Governor a general power to amend that legislation. Defendants contend, on the other hand, that the amendments to the compacts, like the compacts themselves, in no way implicate "legislation," and, therefore, the Governor does not usurp legislative functions in exercising his power to amend them.

The Court of Appeals ruled that this issue was not ripe for review because the Governor had not yet attempted

---

[37] See § 16 of the compacts.

to amend the compacts. However, during the pendency of this suit, Governor Granholm purported to amend the compact with the Odawa Tribe by (1) extending the terms of the compact from twenty to twenty-five years, (2) requiring the eight percent semiannual payment that the tribes must make to the Michigan Strategic Fund to instead be made "to the State . . . as the governor so directs," (3) increasing the semiannual payment from eight percent of profits to either eight, ten, or twelve percent depending on the profits of the casino, and (4) providing less restrictive limitations on gaming by requiring the tribe to make the semiannual payments to the state only as long as the state does not authorize new gaming in ten specified counties rather than statewide as under the original compact terms. Accordingly, this issue is at present ripe for review.[38]

As long ago as 1874, this Court recognized the importance of respecting the proper lines of demarcation

---

[38] The majority concludes that the issue may now be ripe for review, but that this Court should nonetheless decline to review it because the lower courts did not assess this issue. Opinion of Corrigan, C.J., *ante* at 30; opinion of Kelly, J., *ante* at 19. It is true that the Court of Appeals declined to address the issue. However, the circuit court considered it and found a constitutional violation. Further, the parties briefed this issue and, in my judgment, the record is sufficiently developed that we may consider this question without having to first remand it to the lower courts.

between the practices of our three branches of government.

In *Sutherland, supra* at 324-325, Justice Cooley stated:

> And that there is such a broad general principle seems to us very plain. Our government is one whose powers have been carefully apportioned between three distinct departments, which emanate alike from the people, have their powers alike limited and defined by the constitution, are of equal dignity, and within their respective spheres of action equally independent. . . . *This division is accepted as a necessity in all free governments, and the very apportionment of power to one department is understood to be a prohibition of its exercise by either of the others.* [Emphasis added.]

This "broad general principle" elaborated upon by Justice Cooley in *Sutherland* is what is now embodied in the separation of powers doctrine of Michigan's Constitution. Art 3, § 2 of our Constitution provides, "The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

"The legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. Thus, the Governor may not exercise legislative power unless expressly provided for in the Constitution. Yet, the amendatory provision of the tribal-state compacts purports to grant the Governor a broad and undefined legislative power—the power to amend legislation.

**61**

The Legislature may not, either by resolution or by bill, delegate to the executive branch a broad and undefined power to amend legislation. Thus, I would reverse the judgment of the Court of Appeals on this issue and hold that the amendatory provision contained in each compact violates the separation of powers doctrine and is, thus, void insofar as it may be regarded as granting sole amendatory power over legislation to the Governor.[39]

### D. DO COMPACTS CONSTITUTE LOCAL ACTS?

For the reasons set forth in part VI of Chief Justice Corrigan's lead opinion, I do not believe that the compacts violate Const 1963, art 4, § 29. Accordingly, on this

---

[39] Justice Kelly concludes that plaintiffs' challenge to the amendatory provision fails because plaintiffs cannot show that "no set of circumstances exists under which the [a]ct would be valid." *Ante* at 18. She explains that "[t]here are many conceivable amendments that a governor might make to these compacts. For example, a governor could amend the provision relating to dispute resolution or the provision about the timing of payments." *Id.* at 18. For reasons already explained in part III (A) of this opinion, Justice Kelly's examples represent legislative decisions that are properly within the province of the Legislature. That is, such amendment would constitute important policy decisions undertaken in the process of lawmaking and they would supplant legislative action. Therefore, such amendments, undertaken by the Governor and not approved by the Legislature pursuant to Const 1963, art 4, §§ 22 and 26 would offend the separation of powers doctrine. Justice Kelly has not demonstrated that there are, in fact, "conceivable amendments that a governor might make to these compacts," *id.*, so as to not offend this doctrine.

issue, I concur in the lead opinion that the decisions of the lower courts should be affirmed.

### E. Conclusion & consequences

We have been asked to consider, in an action seeking declaratory relief, whether the four tribal-state compacts at issue are inconsistent with various procedures and doctrines embodied in Michigan's Constitution. Having considered the questions presented, I strongly dissent from the majority judgment that these compacts have been effected consistently with our Constitution. I would hold that these compacts constitute legislation and, thus, were subject to legislative approval consistent with the lawmaking procedures of art 4, §§ 22 and 26 of our Constitution. Accordingly, I would reverse the judgment of the Court of Appeals and reinstate the judgment of the circuit court on this issue.

Further, in my judgment, the provision in the compacts that purports to empower the Governor with sole amendatory power over their covenants violates the separation of powers doctrine of art 3, § 2 of our Constitution. I therefore would hold that this provision is void insofar as it grants sole amendatory power over legislation to the Governor. Absent a proper delegation of power to the executive branch, amendments of the compacts must

**63**

themselves comport with the bill-making enactment procedures of our Constitution. Accordingly, I would reverse the judgment of the Court of Appeals and reinstate the judgment of the circuit court on this issue as well.

Finally, I believe that the compacts do not violate the local acts provision of art 4, § 29 of our Constitution. Accordingly, on this issue, I concur with the analysis as set forth in part VI of the lead opinion, and would affirm the decisions of the lower courts.

Concerning the consequences of this opinion for the casinos operated by defendants, I would afford plaintiffs no more relief than that requested. That is, in this action for declaratory judgment, I have sought only to say what the Constitution requires of the compact process. In order to assess the consequences of this requirement for the compacts at issue, other considerations must necessarily come into play, including the standards to be applied by the Secretary of the Interior, pursuant to 25 USC 2710(d)(8), in approving a compact, in particular, a compact approved through procedures apparently acquiesced in by the executive and legislative branches of a state;[40]

---

[40] Generally, deliberate acts of any of the three branches of government are presumed constitutional and,
(continued…)

**64**

the standards by which the Secretary of the Interior will revisit prior approval of a compact;[41] and various equitable considerations pertinent to casinos that have already been built and are presently operating.

The analyses of the majority are deeply flawed and circular. As is typical in cases of this sort, the long-term consequences of the majority judgment cannot be fully predicted, but what is predictable is that there will be consequences in terms of the relationships between the branches of government. The result of the majority's analyses in this case is that a matter of fundamental policy concern to the people of this state—casino gambling and its social and economic impact—a realm in which the federal government has unequivocally authorized Michigan to

---

(…continued)

moreover, "state officials and those with whom they deal are entitled to rely on a presumptively valid state [act], [performed] in good faith and by no means plainly unlawful." See *Lemon v Kurtzman,* 411 US 192, 209; 93 S Ct 1463; 36 L Ed 2d 151 (1973). See also *Thompson v Washington,* 179 US App DC 357; 551 F2d 1316 (1977), *Bd of Comm'rs of Wood Dale Pub Library Dist v Co of Du Page*, 103 Ill 2d 422; 469 NE2d 1370 (1984), and, of significant interest, *Lac Vieux Desert Band of Lake Superior Chippewa Indians v Michigan Gaming Control Bd,* 2002 WL 1592596 (WD Mich, 2002).

[41] The compacts at issue have already been approved by the Secretary of the Interior, and any declaratory judgment along the lines of this dissenting opinion would not, without further action by the Secretary, render such approval null and void.

exercise regulatory authority, has now been transformed into the exclusive province of a single public official, the Governor.[42] By concluding that tribal-state casino gambling compacts do not constitute legislation, and are not required to conform to the legislative process set forth in the Michigan Constitution, the majority has effectively ensured that in future cases the Legislature's role in approving such compacts will exist merely at the sufferance of the Governor. That is, according to the understanding of the majority, unless the Governor agrees in future compacts to affirmatively grant a role for the Legislature, it will have no role. Rather than both the executive and legislative branches being required to

---

[42] Moreover, I fear that the majority's "contractual" approach to Michigan constitutional law in this case cannot be cabined to apply only to tribal-state casino gambling compacts, and do not understand why it would not be equally applicable to *any* compact between Michigan and an Indian tribe, a sister state, or a sovereign nation to which the Governor may be inclined to unilaterally bind the state. The majority appears to grant the Governor a broad power, not even implicitly recognized in the Michigan Constitution, to bind the state as the Governor sees fit, as long as the Governor does so within the framework of the majority's "contractual" approach to compacts, i.e., an approach in which state compacts can be fully understood through resort to the four corners of the compact itself and without consideration to surrounding constitutional circumstances, including the Constitution's separation of powers doctrine, its legislative processes, and the specific limitations it places upon the individual branches of government.

approve the expansion of casinos within Michigan, the approval of a single branch, the executive branch, will be sufficient.

The lead decision represents the first state supreme court decision in the United States to conclude that a tribal-state casino gambling compact does not constitute "legislation" and, therefore, does not require the approval of the branch of government that is most directly representative of the people.

Stephen J. Markman